581 A.2d 864

**STATE of Maryland**

v.

**Claude Fitzgerald WILLIAMS.**

**No. 497, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Order Sept. 25, 1990.

Opinion Nov. 13, 1990.

Certiorari Denied Jan. 4, 1991.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty., for Montgomery County, Rockville, on the brief), for appellant.

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellee.

## ORDER

PER CURIAM.

For reasons to be hereafter stated in an opinion to be filed, a majority of the panel concurring, the suppression order appealed from is hereby reversed and the case remanded for trial. Costs to be paid by appellee. Mandate to issue forthwith.

Argued before GARRITY, BLOOM and ROBERT M. BELL, JJ.

GARRITY, Judge.

The appellee, Claude Fitzgerald Williams, who was charged with possession of cocaine, possession with intent to distribute cocaine, and conspiracy to distribute cocaine, moved to suppress evidence. The motion was granted by the Circuit Court for Montgomery County, and the State noted an appeal pursuant to Courts and Judicial Proceedings Article § 12–302(c)(3). By order dated September 25, 1990, we reversed the decision of the circuit court and, because of the time constraint of that statute, we directed that our mandate issue forthwith, with our opinion to follow.[1]

## FACTS

Sergeant Charles W. Jagoe, an experienced narcotics investigator for the Takoma Park City Police, testified that

---

1. Failure to render a decision within 120 days after the record on appeal is filed in the appellate court would result in the decision of the lower court becoming final. The record was filed in this court on May 29, 1990.

he received a tip from a registered confidential informant who advised that "there would be a drug delivery in front of 7611 Maple Avenue in Takoma Park and that the people who were to receive the narcotics were one Shirley Gerald, a Jose, and some other people...." The informant stated that the delivery vehicle would be tan or gold and that there might be a second vehicle which would be a late-model blue car. The informant related that the delivery people would all be black males and identified one of them as "Calvin." Based on this information, Jagoe immediately drove to the Maple Avenue address in an unmarked police car. Upon arrival, Jagoe observed Shirley Gerald and Jose seated on a wall directly in front of the address. Additional individuals, whom Jagoe recognized as "narcotics abusers from other investigations," were seated nearby.

While Jagoe was observing the situation from a parking lot across the street, a citizen, whom he did not know, approached him. Jagoe testified that this individual, who appeared distraught, advised him that someone to whom the citizen was related would be involved in a drug transaction that would include a cocaine delivery in front of 7611 Maple Avenue.[2] In addition, Jagoe testified: "That this subject told me that it was related to one of the subjects involved in this transaction and that it was fed up and didn't want to see this person destroy its life." This person also stated that the suspects would be driving a tan or gold-colored vehicle which would be arriving in thirty minutes, and that Shirley Gerald would be a participant in the transaction.

At 2:55 a.m., while Officer Jagoe remained on surveillance, a person, who identified him/herself as the same person who had approached Jagoe earlier in the parking lot, telephoned the Takoma Park police station and related that the location of the delivery had changed to the intersection of Grant Avenue and Carroll Avenue in Takoma Park.

---

2. Officer Jagoe testified that to his knowledge the citizen informant was not involved in the drug milieu.

After receiving this information from the dispatcher, Jagoe drove to that location and arrived there at 3:00 a.m. He described the area as "extremely well lit" by "large helium vapor lights that really light up the area well."

From his vantage point near the Grant and Carroll intersection, Jagoe observed a woman, whom he did not know, standing in the center of a park area.[3] At approximately 3:09 a.m., Jagoe watched a tannish gold 1988 Toyota Cressida pull into the parking lot of a Texaco station which was located across the street from the park.[4] The appellee jumped out of the car from the driver's seat and dashed across Grant Avenue to the area where the woman was standing while his two passengers waited in the car. After speaking with the woman, Williams ran back across the street toward his car. Based on the information he had received from the two informants, as well as his own observations, Jagoe believed that Williams was in the process of making a drug delivery, although he had not observed an actual exchange to have taken place. At this point, Officer Jagoe called for a backup and Officer Bryan Davis responded to the scene driving a marked police cruiser. Jagoe then left his surveillance area, which was across the street from the park, turned on his headlights, and drove towards Williams. According to Jagoe the following events precipitated the arrest:

> Mr. Williams did not see me; I was in a yellow Chrysler four-door New Yorker. I came up on his side. As I did so, Mr. Williams observed the police car come around the side of the building towards the parking lot of the gas

---

3. This woman was not Shirley Gerald.

4. Officer Jagoe testified that there had been an on-going investigation over the past few months which involved information that "Calvin," who also had been mentioned by the confidential informant as being involved in the transaction, had been using a Toyota to deliver drugs to 7611 Maple Avenue. At some point, that same Toyota Cressida had temporary tags which were registered to a "Miss Pope." After Williams was arrested, the police discovered that the vehicle he was driving at the time of his arrest was the same Toyota that was registered to "Miss Pope."

station. This police officer [Davis] had turned his emergency lights on on the top. His [Williams'] observing the police officer, threw bags of suspected crack cocaine in the direction of my unmarked police car.[5] I had already stopped my vehicle. I jumped out. The officer jumped out of his police car. Mr. Williams was ordered to the ground, as well as the subjects in the vehicle were ordered out of the vehicle onto the ground.[6]

Williams' motion to suppress the tangible evidence was granted on the grounds that the police did not have articulable suspicion to justify stopping Williams. The State contends that the quality and quantity of information provided by the informants furnished the police with reasonable articulable suspicion to justify the stop.

## *Investigatory Stop*

Although the lower court appears to have determined that the stop took place when the marked police car was approaching the service station parking lot, our cases recognize that mere pursuit does not constitute a stop. In *Timms v. State*, 83 Md.App. 12, 16–19, 573 A.2d 397 (1990), we re-examined the test for determining when a person has been "seized" within the meaning of the Fourth Amendment: "The police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the

---

5. In cross-examination, Officer Jagoe further testified that when the appellee threw the drugs to the ground, Officer Davis' police cruiser had not entered the parking lot of the service station. Jagoe further stated that when the appellee threw the zip lock bags towards him, he was 10–15 feet away and was able to recognize immediately that each bag contained a rock of cocaine. The appellee, in its brief, states that the appellee was driving his automobile out of the parking lot when the marked police car arrived. Officer Jagoe's testimony, however, tends to indicate that the appellee had not gotten back in his car when the marked police car approached and the appellee threw away the cocaine.

6. Upon search of the vehicle, the police recovered one rock of crack cocaine next to the passenger side door and a small amount of marijuana underneath the seat.

incident, a reasonable person would have believed that he was not free to leave.'" Id. at 17, 573 A.2d 397 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)). *See also Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989). In giving shape to this standard in *Timms*, we recognized that "[t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct taken as a whole, rather than focus on particular details of that conduct in isolation." *Id.* 83 Md.App. at 17, 573 A.2d 397 (quoting *Chesternut, supra,* 486 U.S. at 572, 108 S.Ct. at 1978). In *Timms*, we identified the facts that tend to demonstrate coercive police conduct as actions manifesting "aggressive" police conduct. *Id.* 83 Md.App. at 20, 573 A.2d 397.

In *Timms*, by way of comparison, we revisited *Chesternut.* In that case, while on a routine patrol, the police saw a car stop. Its occupant alighted and approached Chesternut, who was standing on a corner. When Chesternut saw the police car, he turned and ran away. The police followed him around a corner to investigate the situation, and quickly caught up with him. Driving alongside him for a short distance, the officers observed Chesternut discard some packets from his pocket. When one of the officers, who had experience as a paramedic, retrieved the packets, he "surmised" that their contents contained cocaine. In holding that even though one of the officers characterized the episode as a "chase," Chesternut had not been seized prior to discarding the packets, the Supreme Court observed:

The police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt or displayed weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement.... *While the very presence of a police car driving parallel to a running pedestrian could be*

> *somewhat intimidating, this kind of police presence*
> *does not, standing alone, constitute a seizure.*

486 U.S. at 575, 108 S.Ct. at 1980 (emphasis added). Bearing in mind that the Court did not determine "the circumstances in which police pursuit could amount to a seizure under the Fourth Amendment," 486 U.S. at 575–76 n. 9, 108 S.Ct. at 1980–81 n. 9, we now turn to the case *sub judice.*

The evidence shows that while Jagoe was driving his unmarked car alongside Williams, Williams apparently did not recognize Jagoe as a police officer. At the time Williams observed the marked police cruiser coming toward the service station parking lot, neither Jagoe nor Davis had ordered Williams to stop. Indeed, at that point, there had been no communication whatsoever between Williams and the police officers. Prior to the moment that Williams threw the bags of suspected cocaine toward Jagoe, the only action that could be reasonably characterized as "aggressive" police conduct was that of Officer Davis proceeding towards the service station in the police vehicle with the emergency lights on. Moreover, the evidence is unclear as to whether this act even rose to the level of "pursuit." *Compare State v. Lemmon,* 318 Md. 365, 568 A.2d 48 (1990) (two police officers pursued Lemmon on foot as he ran away, while a third police officer, following in his police car, tried to block his escape).

Nevertheless, at the suppression hearing, the State conceded that the appellee had been stopped or seized before he threw away the contraband, and the decision of the circuit court was based on that concession.[7] In view of the concession and the court's reliance thereon, we are constrained to treat the cocaine as having been seized rather than abandoned. Therefore, we must determine whether the police stop of the appellee was based upon grounds sufficient to pass constitutional muster. An investigatory

---

7. Although the State conceded that a seizure had taken place prior to abandonment of the cocaine by Williams, such concession does not appear to have been warranted by the record presented to us.

stop may be made upon "specific articulable facts" which would lead a reasonable police officer at the inception of the stop to conclude that a brief detention of the individual would be appropriate. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968). The Supreme Court has delineated the general contours of the quality and quantity of evidence required to show reasonable articulable suspicion by way of contrast to that required to show probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause but also in the sense that reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause.

*Alabama v. White,* —— U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (emphasis added).[8]

We now turn to the issue of whether the registered informant's tip, together with the information furnished by the citizen who approached Officer Jagoe and then telephoned the police station, justified a *Terry* stop or were so "completely lacking in indicia of reliability [that they] would either warrant no police response or require further investigation before a forceable stop of a suspect would be authorized." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court was confronted with an anonymous tip in the probable cause context. Although the Court emphasized the relevance of the informant's veracity, reliability, and basis for knowledge, the Court held that the challenged police conduct must be viewed in light

---

**8.** The level of suspicion necessary to show reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. *U.S. v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *see also Quince v. State,* 319 Md. 430, 433–34, 572 A.2d 1086 (1990) (collecting cases).

of the "totality of circumstances." *Id.* at 230–31, 103 S.Ct. at 2328–29. More recently, in *Alabama v. White,* 110 S.Ct. 2412, 2414–17, the issue of whether an anonymous tip was sufficiently reliable to furnish the police with reasonable suspicion was squarely before the Court. In *White,* an anonymous person telephoned the police and related that White would be leaving an apartment at a certain time in a particular vehicle and that she would have cocaine in her possession. The officers verified the description of the vehicle and observed White, empty-handed, leaving an apartment. After they stopped the vehicle en route to the destination that the caller had predicted, the officers conducted a consensual search and discovered marijuana in an attache case. Upon arresting White they found cocaine in her purse. In reversing the judgment of the lower court, the Court concluded that "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion...." *White, supra,* 110 S.Ct. at 2416. In holding that under the totality of circumstances an anonymous tip may be sufficient indicia of reliability to justify an investigatory stop, the Court reasoned that the information provided by the tipster was reliable because the "significant aspects of the caller's predictions were verified." *White, supra,* 110 S.Ct. at 2417.[9] The Court stated, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if it were more reliable." *Id.* at 2416. In stressing the importance of the predictive value of the caller's tip the Court observed that: "Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for the police to believe that a person with access to such information is likely also to have access to reliable information about that individual's illegal activities." *Id.* at 2417.

---

9. In so holding, the Court noted that there were details mentioned by the tipster which had not been verified. *Id.* at 2416.

The facts of this case demonstrate that the police had articulable suspicion to stop Williams. It is important to bear in mind that the first tip Jagoe received was from a reliable confidential informant, not an anonymous tipster. Officer Jagoe testified:

I received information from a confidential informant who had been utilized by our department on numerous occasions and given the confidential information number of 88001. This informant has been extremely reliable and has resulted in the execution of at least five search and seizure warrants and the arrest of numerous subjects.[10]

The informant advised Jagoe that there would be a cocaine transaction in the near future in front of 7611 Maple Avenue, specified the names of certain people who would be involved—Shirley Gerald, Jose, and Calvin—as well as the color of the delivery vehicle. When Jagoe arrived at the Maple Avenue address, he immediately observed Shirley Gerald, Jose, and others known to him as drug users. The registered informant's tip was corroborated when Jagoe was approached by the anonymous person who confirmed many of the details provided in the confidential informant's tip: that a drug transaction would occur in front of 7611 Maple, that the delivery people would be driving a tan/goldish vehicle, and that Shirley Gerald would be involved in the transaction. At this point, the information provided by the two tipsters was mutually confirming after Jagoe had personally observed substantiating details. Additionally, even though the identity of the citizen informant was unknown, his/her apparent motive for furnishing the

---

**10.** While the information provided by the confidential informant in the instant case is somewhat similar to the information provided by the tipster in *Green v. State*, 77 Md.App. 477, 551 A.2d 127, *cert. denied*, 315 Md. 692, 556 A.2d 674 (1989), the facts in *Green* were measured against a probable cause standard. Furthermore, in *Green*, there was absolutely no evidence presented as to the basis of the "registered informant's" reliability. *Id.* at 478 n. 2, 551 A.2d 127. In his analysis of the case, the hearing judge in the case at bar appears to have erroneously characterized the informant in *Green* as a reliable confidential informant.

police with information was out of concern for a relative. Thus, when the anonymous informant advised the police that the location of the drug transaction had moved from the Maple Avenue address to the Carroll and Grant Avenue intersection, we believe that the information could be relied upon as credible. Moreover, the specificity of the information in terms of the location of the transaction, the delivery vehicle and the time that the transaction would occur served to demonstrate the informant's personal knowledge of the forthcoming illegal activity. *See e.g. Jackson v. State*, 81 Md.App. 687, 693, 569 A.2d 712 (1990).

In confirmation, Jagoe observed (1) an unknown woman who appeared to be anticipating a rendezvous in the park at 3:00 a.m.; (2) Williams' arrival at the intersection in the vehicle described by both the confidential informant and the unknown informant; and (3) Williams' arrival only 14 minutes after Jagoe had received advice that the scene would be changed to that location.

Although Jagoe did not observe any illegal activity at that time, he did not have to in order to entertain a reasonable suspicion that criminal activity was afoot. The fact that no drug delivery took place did not negate the reliability of the information received by the police. From Jagoe's standpoint, the participants had apparently chosen, at the last moment, to abort the delivery. It was not unreasonable for him to suspect that contraband was at the scene ready to be delivered. A police officer need only verify "significant aspects" of an informant's prediction in order for the prediction to carry sufficient indicia of reliability to justify an investigatory stop. *White, supra,* 110 S.Ct. at 2417. The reliability of the informants in the instant case is bolstered by the same factors that buttressed the anonymous informant's information in the *White* case: "When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least enough to justify the stop." *Id.; Gates, supra,* 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. *See also Potts v. State,*

300 Md. 567, 574–75, 479 A.2d 1335 (1984). The specificity of the information provided in the tips distinguishes the instant case from *State v. Lemmon,* 318 Md. 365, 379, 568 A.2d 48 (1990), where the anonymous tip merely alleged "something was occurring" and contained no allegations as to how, or by whom, it was to have occurred. Moreover, because the informants stated that a drug transaction would occur, the instant case is unlike the situation in *Jones v. State,* 319 Md. 279, 572 A.2d 169 (1990), where the police officer observed only innocent acts and had no knowledge of future, on-going, or past illegal activity occurring in the area. Furthermore, the fact that the citizen who approached Officer Jagoe gave him substantially the same information that he had received from the registered informant lends credence to both sources of information.

For the reasons stated above, we reversed the order of the circuit court sustaining the appellee's motion to suppress the evidence.

ROBERT M. BELL, Judge, dissenting.

The Supreme Court, in *Alabama v. White,* 496 U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), addressed the question, "whether [an anonymous telephone] tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." In answering that, under the circumstances of that case, it did, the Court resolved conflicts in state and federal court decisions on the issue. 110 S.Ct. at 2415. The Court's holding was not entirely unexpected, however. *See Illinois v. Gates,* 462 U.S. 213, 246, 103 S.Ct. 2317, 2336, 76 L.Ed.2d 527 (1983); *Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 1925, 32 L.Ed.2d 612 (1972). In fact, a divided panel of this Court, in *Millwood v. State,* 72 Md.App. 82, 87–94, 527 A.2d 803 (1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), anticipated the *White* holding. The majority, therefore, is correct, reasonable suspicion for an investigatory stop may rest upon information furnished in

an anonymous tip. The majority makes much of the point. Unfortunately for the majority, that is not the issue in this case.

Nor is the issue whether the tipster's information was sufficiently corroborated to have rendered the tip trustworthy enough to have justified an investigatory stop prior to the time when appellant started to return to his car and the female, with whom he met, left the scene. For purposes of this opinion, I am prepared to concede that the citizen tipster, by providing information quite similar, if not identical, to that supplied by the confidential, reliable informant, demonstrated sufficient reliability to have justified the officer's reliance on the citizen's subsequent tip and, thus, his entertaining a reasonable suspicion that the delivery location had been changed. Furthermore, I do not think it necessary (although I think it reasonable, as the court found [1]) that the details as to the receivers and deliverers of

---

**1.** If the information supplied by both the tipster and the informant as to the first location is deemed to be so interrelated to that supplied by the tipster as to the second location as to be inseparable, it is *nevertheless* far from clear, as the majority seems to believe, that an investigatory stop was warranted on that basis. Because the only information concerning the second location comes from the citizen, it is the citizen's credibility, *i.e.* track record, that must be evaluated. When it is recalled that nothing occurred at the first location, it seems obvious that the citizen *has no track record.* Furthermore, none of the players mentioned in connection with the first location were present at the second location except, arguably, those in the tannish gold car.

The trial court took this approach in ruling on the motion to suppress. The court said:

So then what you have to look at is you have to look at what happened and how many of the details were right. Were all details right or were only part of the details right. Well, the only details that are right in this case is that it was a tan car and that it was the location. A tan car at this location.

We never knew who the seller was. It is not the same buyers and it is not the same place. I just don't think you can put the two together. What you really have, you have nothing more than what you would have if an independent citizen calls the police and says there is going to be drug transaction occurring perpetrated by somebody in a tan car at this location. That is really essentially what you have here and the police go and observe that.

the cocaine, initially provided by both the citizen and the reliable informant in connection with the first location, be strictly applied to the changed location.

In my opinion, the issue presented, one of first impression, *involves the life expectancy of reasonable articulable suspicion. Stated more precisely, it* is whether specific and sufficient articulable suspicion to conduct an investigatory stop can survive observations which negate, rather than confirm, the bottom line prediction—in this case, that drugs would be delivered to a certain location—of the tipster? Stated differently, where an anonymous tip that a crime will be committed, some of the details of which have been verified, supplies a police officer with reasonable suspicion sufficient to conduct an investigatory stop and the officer chooses not to make such stop until after the point when the crime should have occurred, but the crime does not occur, may the officer thereafter, nevertheless, conduct an investigatory stop? This issue was not addressed in

---

Now, they know that it is not the same buyers and there is nobody else around. It is 3:00 in the morning. There is one person there who can buy drugs and they know no drug transaction took place. That is really a key factor here. There is nobody else around to buy drugs so if there was going to be a drug transaction why wasn't it? All they know is that this man—there was no flight as there was in *Green* [*v. State*, 77 Md.App. 477, 551 A.2d 127 (1989) ] and of course the Court in *Green* said that that flight wasn't enough without something else. But there is no flight here. He runs out of his car and he runs back.

Based on the *Green* case, based on what I find the facts to be, I can't find that the officer had probable cause or even a reasonable suspicion to stop this man. The only thing he did was he was a person who drove in a tan car. That is all we know. Given all that, I'm going to suppress the evidence that was seized.

The lower court's first level fact-finding is entitled to deference. *See McAvoy v. State*, 314 Md. 509, 514–15, 551 A.2d 875 (1989); *In Re: Anthony F.*, 293 Md. 146, 152, 442 A.2d 975 (1982); *Parker v. State*, 66 Md.App. 1, 10–11, 502 A.2d 510, *cert. denied*, 306 Md. 70, 507 A.2d 184 (1986). The findings are not clearly erroneous. Moreover, I believe that making an independent constitutional appraisal of the record to determine what to make of those facts leads inescapably to the conclusion that the trial court correctly suppressed the evidence. *McAvoy v. State*, 314 Md. at 515, 551 A.2d 875.

*White* and it has never been addressed by an appellate court in this State.

There is no dispute concerning the facts.[2] Officer Jagoe, having received information from the citizen tipster that the delivery location had been changed, proceeded to the new location. Once there, he observed: 1) a female standing in a park area; 2) appellee arrive in a car matching the description of the delivery car; 3) a meeting between appellee and the female; 4) the female leave the area; and 5) appellee start to return to his car. He observed neither the delivery of cocaine, as the tipster had predicted, nor an exchange of any kind, although he had a perfect vantage point from which to do so, had one occurred. *Notwithstanding, the officer decided to conduct an investigatory stop of appellee, which was done as appellee was returning to his car and the female was leaving the area.*[3]

---

**2.** With few exceptions, I do not quarrel with the facts as set out by the majority. I think it significant, however, that when appellee left the park area, the female, with whom he met, also left. The majority studiously avoids that "fact". Moreover, the observations in footnote 4 of the majority opinion are, for purposes of this case, irrelevant. The connection between the delivery car and the information concerning "Calvin's" involvement in drug deliveries, in general, and this delivery, in particular, did not become apparent until after appellant's arrest.

The majority uses quite a lot of space to rehearse the facts, presumably to demonstrate that the record evidence is inadequate to support a finding that appellee was seized before he discarded the cocaine. *We all know, and agree, see note 3 infra, that the State conceded the point below.* Therefore, that the majority dwells on the point is perplexing. Perhaps, reminiscent of a ploy often utilized by experienced trial counsel, the majority has chosen to argue the facts, the law not being as clearly on its side as it would like. Using this approach, it hopes that the clearer it can establish that appellee did, in fact, possess cocaine, the easier it will be to convince the reader that its position is correct.

**3.** At oral argument, the question was raised whether appellee was in his car, or was returning to his car, when he was stopped. We were told that appellee was stopped as he was driving out of the parking lot. That is consistent with the representation in the State's brief. The transcript seems to contradict that representation, however. A reading of Jagoe's testimony suggests that appellant was stopped as he returned to, but before he reached, his car. Nevertheless, in argu-

According to the majority, because the officer, based upon the information supplied by the citizen tipster, had a reasonable suspicion that criminal activity was afoot, the investigatory stop was justified and legally permitted. That it occurred after appellee met with the female, with no transaction of any kind having been observed is, to the majority, of no moment. It says that Jagoe did not have to observe illegal activity, he only had to "verify 'significant aspects' of the informant's prediction in order for the prediction to carry sufficient indicia of reliability to justify an investigatory stop." The majority relies upon *White*, 110 S.Ct. at 2417.

The majority is simply wrong. *White* never addressed this issue. Indeed, *White* supports the trial judge's ruling.

In *White*, the defendant was stopped before she reached the destination predicted by the tipster. Significantly, however, many of the details the tipster provided had been corroborated by the time she was stopped. Of primary significance to the Court's conclusion that the investigatory stop was justified on the basis of specific articulable facts— "because it demonstrated inside information—a special familiarity with [the defendant's] affairs," 110 S.Ct. at 2417,- —was the accuracy with which the tipster had predicted the defendant's future conduct. There, the tipster predicted that there would be a brown station wagon in front of a particular building at a particular time and that the defendant would, within that time frame, leave the building and enter that particular station wagon and proceed to an

ment before the lower court, the State conceded that appellant was stopped and that concession was received and considered by the court. Under the circumstances, the majority acknowledges that it is "constrained to treat the cocaine as having been seized rather than abandoned."

The majority notes in footnote 7 that the State's concession "does not appear to have been warranted by the record presented to us." This is, of course, true and I acknowledged as much above. It is not possible to say more, however, because the concession avoided the need for further clarification of the record. It is *quite* possible, in other words, that the concession is justified.

identified destination. Police observations confirmed most of the tipster's predictions.[4] In addition, because the stop occurred before the final destination was reached, the Court observed that the police confirmed that the route the defendant took was the most direct one to the destination to which the tipster predicted she would go. It was in this context that the Court indicated that "when significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." 110 S.Ct. at 2417.

The real and, indeed, it may be postulated, the only, purpose of a tip is to provide law enforcement personnel with information concerning criminal activity. More often than not, in addition to a prediction of a criminal violation, the tip contains information pertaining to the where, when, and how of the crime's commission. When the tipster has no track record, the law enforcement personnel may assess his or her credibility in at least two ways. One, they may corroborate any details supplied by the tipster, to bolster the ultimate prediction. Those details may, themselves, involve predictions of future conduct, although short of that which would constitute the predicted criminal activity. In such situation, verification of a sufficient number of the details demonstrates the tipster's credibility and, consequently, justifies an investigatory stop. This is the *White* situation.

The second method of assessing the tipster's credibility involves testing the accuracy of the ultimate prediction, itself, *i.e.*, determining whether the predicted activity does or does not occur. When this option is used, corroboration of the tip results in catching the criminal red handed in the commission of the predicted, or related, criminal activity.

---

4. The tipster said that the defendant "would be in possession of about an ounce of cocaine inside a brown attaché case." 110 S.Ct. at 2414. The defendant did not have an attaché case when she left the building and entered the car.

On the other hand, failure to corroborate the tip results in the negation of the prediction, *i.e.,* the observation of no criminal conduct. Whether the tip is verified or negated, when this option is used the investigatory process is at an end. Therefore, when the prediction which was the real object of the tip is negated, rather than confirmed, the prior corroboration of details tending to support the accuracy of the now unsubstantiated prediction, no longer supports reasonable articulable suspicion justifying an investigatory stop. This is so *both* because those details can have no more relevance or effect than the accuracy of the prediction they underlay *and because there is no further need for investigation.* In other words, if no criminal activity occurs as predicted, verification of details supportive of the prediction loses the effect it had when the prediction remained plausible.

In assessing the reasonableness of a stop made after the ultimate prediction has been negated, a court may not rely solely upon the accurate predictions underlying the tip and disregard all other observations. On the contrary, evaluation of the totality of the circumstances requires that it also consider the accuracy of the ultimate prediction. It is, after all, the accuracy of that prediction by which the tipster's *ultimate* worth must ultimately be judged. Therefore, just as corroboration of significant aspects of the tipster's prediction is critical to the officer's formation of reasonable suspicion, his failure to corroborate or, more to the point, the negation of, the bottom line prediction must necessarily dissipate any reasonable suspicion which theretofore may have existed.

*White* does not even suggest, much less hold, that an investigatory stop would have been permitted had, instead of being stopped before she reached the predicted destination, the defendant had been allowed to continue and she had not stopped at that destination. What the Court said on the subject suggests otherwise:

As for the caller's prediction of respondent's destination, it is true that the officers stopped her just short of

Dobey's Motel and did not know whether she would have pulled in or continued on past it. But given that the four-mile route driven by respondent was the most direct route possible to Dobey's Motel, ... but nevertheless involved several turns ... we think respondent's destination was significantly corroborated.

It must be recalled that even the majority in *White* characterized it as a "close case." 110 S.Ct. at 2417.

Here, unlike in *White*, the officer undertook to corroborate not only the facts underlying the tip, but the bottom line prediction itself, *i.e.* that a cocaine delivery would occur. In short, he chose to go for an arrest; he decided to allow the scenario to play itself out in the hopes that he would observe, first hand, criminal conduct which would justify appellee's arrest. When that did not occur, the reliability of the tip and the credibility of the tipster were negated, as was the reasonableness of the suspicion which the corroboration of the underlying details engendered.

The majority says that the officer's failure to observe a drug transaction or, for that matter, an exchange of any kind does not negate the accuracy of the tipster's information. In justification of that conclusion, it tells us:

From Jagoe's standpoint, the participants had apparently chosen, at the last moment, to abort the delivery. It was not unreasonable for him to suspect that contraband was at the scene ready to be delivered.

There is absolutely nothing in the record that supports those statements. And, as I have already demonstrated, *White* certainly does not. Adopting the majority's position and taking it to its logical conclusion *would* mean that reasonable suspicion, once acquired, can never be dislodged. That simply cannot be. The police cannot pursue an investigation to its conclusion by waiting for a crime to occur and, then, when it does not, still conduct an investigatory stop as if it had. *There is, at that point, simply no need for an investigatory stop.* But, notwithstanding, and despite its attempt to fit this case into the *White* rule, this is precisely what the majority's holding now permits.

In conclusion, the majority may be right, the tip may well have given the officer reasonable suspicion to believe that a drug delivery was going to occur. That suspicion, in turn, may well have justified an investigatory stop of the appellee prior to, or during, the meeting with the unknown female. After the investigation was concluded, however—when the female began to leave the area and appellee started toward his car—without a delivery having been made, it was clear that the prediction of criminal activity was inaccurate. Prior accurate predictions of details cannot overcome that fact and neither can the reasonable suspicion dependent upon those predictions.

The circuit court correctly granted the motion to suppress. Accordingly, I dissent.