612 A.2d 296

**Jack I. BAZIZ**

v.

**STATE of Maryland.**

**No. 1670, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Sept. 8, 1992.

**286**

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before DAVIS, MOTZ and HARRELL, JJ.

HARRELL, Judge.

After a bench trial in the Circuit Court for Baltimore County, appellant, Jack I. Baziz, was convicted of possession of cocaine with intent to distribute it. He was sentenced to three years in prison, with eighteen months suspended in favor of two years of probation. This appeal followed.

On appeal, appellant contends that the suppression judge erred in denying his motion to suppress incriminating evidence, including a confession, obtained as a result of his arrest, because the arrest was made without a warrant and without probable cause. We agree with appellant's contention. Accordingly, we must reverse the conviction.

### A.

Detective Douglas Kriete of the Baltimore County Police Department was the first witness to testify at the suppression hearing. Kriete testified to the following facts. On 26 October 1990, he was involved in an investigation of Simon Alpert. Prior to 26 October 1990, Alpert made a cocaine sale to one of Kriete's undercover colleagues, Detective Jim Dorsey, in Alpert's apartment in the Worthington Place Apartment Complex (Complex) in Owings Mills, Maryland. Alpert had arranged for another transaction with Dorsey to take place on 26 October 1990 at 1:00 p.m. in the parking lot adjacent to the Complex. Kriete was assigned to watch the transaction and, via radio, inform the other members of the investigation team of what transpired. From an observation post across the street from the Complex, Kriete could see through a large glass window on Alpert's building into the hallway outside Alpert's apartment, but not into the apartment itself.

At the scheduled time of the sale, Kriete saw Alpert and appellant emerge from Alpert's apartment. Kriete was not acquainted with appellant and had no information concerning him. Alpert and appellant conversed in the hallway outside Alpert's apartment and looked around the parking

lot adjacent to the Complex through the large glass window. Dorsey was already waiting in the parking lot. Alpert entered the elevator, then emerged from the building and approached Dorsey in the parking lot. The two conversed. They then entered Alpert's car and drove off together. Appellant, who had remained at the window up to that time, reentered Alpert's apartment. Alpert and Dorsey returned to the parking lot seven or eight minutes later. After they conversed briefly, Dorsey left. Alpert returned to his apartment. Ten minutes later, Alpert and appellant reemerged from the apartment, went to the parking lot, and drove off together in Alpert's car. Kriete did not see any exchange of money or drugs between Alpert and appellant.

Based upon his observations and information about Alpert, as well as his eight years of experience as a police officer and four years of experience as an officer in the Narcotics Division, Kriete concluded that appellant was Alpert's source of cocaine. Kriete explained that drug sources generally do not wish to meet ultimate purchasers, preferring instead to "remain back in the background and observe in the background." Kriete attached significance to the fact that the previous transaction between Alpert and Dorsey took place in Alpert's apartment:

> [I]t seemed to us that [Alpert] did not want Detective Dorsey up there because of a certain reason. [Appellant] maintained his status as far as he could, but yet oversaw all of the actions that were taking place at that time.

Furthermore, Kriete was aware that Alpert's usual source of drugs was incarcerated, Alpert having previously mentioned this fact to Dorsey, who in turn passed it along to the investigation team. According to Kriete, the latter fact, combined with appellant's presence at the date and time scheduled for the cocaine sale, gave heft to his conclusion that appellant was Alpert's new source of cocaine:

> Alpert's source was no longer available to him, which indicated to us that he does ... have another source of

cocaine, the reason the ... buy was set up on that particular day.

Kriete admitted on cross-examination, however, that it is "not uncommon" for drug dealers to keep stashes of drugs obtained from one source at different locations.

Sergeant David Diseroad, who was in charge of the investigation on 26 October 1990, also testified at the suppression hearing. Diseroad testified to the following facts. He was kept informed of events by Kriete and Dorsey and knew that the scheduled sale had been consummated. Diseroad followed Alpert's car after Alpert and appellant had left the Complex. Alpert's car pulled into a car wash parking lot, dropped appellant off, and drove away. Diseroad, after parking his car, followed appellant into the office of the car wash. Diseroad saw that appellant had "a wad of cash kind of rolled up in his hand." Diseroad pulled out his badge and identified himself to appellant as a police officer. He told appellant that he wanted appellant to answer some questions and to step outside with him. Appellant acted "relatively nervous[.]" As Diseroad and appellant walked out the door to the office of the car wash, two other police officers approached from their left. Diseroad directed appellant toward the officers. At that point, "he [appellant] looked to his right ... away from the officers and he made a couple quick steps like he was going to run." Diseroad and the other officers grabbed appellant and put him against a car, where they "conducted a search." They found seven hundred dollars in appellant's hand. The serial numbers of the bills matched those of the bills that Dorsey had given to Alpert in exchange for cocaine.[1]

Detective Maurice Xenos was one of the officers at the car wash. Xenos, like Diseroad, testified at the suppression hearing that after Diseroad and appellant exited the door to

---

1. Prior to the drug transaction on 26 October 1990, the police made photocopies of the bills that were to be used to purchase cocaine from Alpert.

the office of the car wash, "it looked like he [appellant] was going to take off. At that time we grabbed him." After the officers had placed appellant against a car and begun to "pat him down for weapons[,]" Xenos testified, appellant, without being asked any questions, "told me [Xenos] to get two ounces of coke in the front of his pants."

Appellant, who testified on his own behalf at the suppression hearing, asserted that, up to the time he and Alpert left the Complex together in Alpert's car, he was inside Alpert's apartment and "was never at the window [in the hallway outside Alpert's apartment]." Appellant also provided a far different account than did Diseroad and Xenos of what transpired at the car wash. Appellant testified that he walked into the office of the car wash with fifty dollars in his hand to pay for his car, which had been waxed. Thereafter, according to appellant, the following occurred:

> In front of my face came a badge like this. I turned around real slowly and the officer told me to follow him outside. I did. I immediately followed him outside.
>
> When I opened up the door all I saw were a lot of people standing to the left, which turned out to be police officers.
>
> [One of the police officers] looked at me and he said, you look pretty quick, go for it. Exactly.
>
> ... I wouldn't run. They grabbed me, threw me on the car with my head first, and reached around my jacket ... handcuffed me. And then I felt a metal—before they handcuffed me I felt a metal object to my head. I turned my eyes and it was a gun. I was handcuffed.
>
> Then they lifted me up and they started to search me for drugs and weapons. And [one of the police officers] reached on my crotch and he said, what is this? I said, it's two ounces of cocaine. He pulled it out and he reached in my crotch and pulled out the big wad of money and reached over and handed it to the other police officer.

The circuit court denied the motion to suppress, ruling that the police had probable cause to arrest appellant based upon Kriete's observations.

Let's forget about the question of whether he started to run or whether they thought he was going to run or whether he did actually run or whether he didn't run.

That is not the point. I am not too concerned about what happened that late in the situation. What I see is this, the police have an awareness of the fact that Alpert's premises has been used and is being used for transactions involving controlled dangerous substances.... They know that activity is taking place there.

They are about to execute a warrant and I don't think that is of great significance.[2] Because I don't know what the warrant said. That is not before me. But at least they felt they had enough to go ahead with a warrant....

Shortly before they are ready to pounce on Mr. Alpert and execute the warrant, and with the knowledge in addition that Alpert's source or apparent source is out of commission, they see [appellant] in the area leaving the apartment—taking the testimony offered by the State in the light most favorable to the [S]tate[3]—standing, observing the general scenery, talking to Al[p]ert. Don't know what was said of course.

Al[p]ert then leaves and goes to the parking lot, meets [Dorsey], makes a controlled sale. [Appellant] is still up

---

2. Police had obtained a search warrant for Alpert's apartment prior to Kriete's observations.

3. Based upon the circuit court's statement that it was "taking the testimony offered by the State in the light most favorable to the [S]tate[,]" appellant argues, in a footnote, that the court improperly "view[ed] testimony in a light favorable to the State" and thereby shifted the burden of proof onto appellant. *See Trusty v. State*, 67 Md.App. 620, 623, 508 A.2d 1018 (1986), *modified*, 308 Md. 658, 521 A.2d 749 (1987). This issue was not raised below, and appellant does not urge us to take cognizance of and correct as plain error the trial court's alleged action. Accordingly, we do not consider appellant's argument. Rule 8–131.

in the area. He is still there when Al[p]ert comes back. Then they, the two of them, leave.

Now, there is nothing ... that happens after that that is of any great concern. It's the fact that [appellant] is there in the vicinity of the premises where transactions are taking place, interchanging conversation and observing what could have been the comings and goings, probably was the comings and goings, the detectives and the buy, which we know was in fact made ...

I will certainly grant you ... that it's thin. But I think there is enough there to establish [appellant] as a viable suspect in this transaction. I think they had enough at that time, at that point, to make an arrest. The rest is window dressing. Whether he bolted, whether he didn't bolt, whether he was patted down first or handcuffed first, or whether there was a gun brought out ...

I think the probable cause is established at the time of these observations, connected with his activities at the time he was there. He's there after the owner of the premises leaves. Waits for him to come back. There is some relationship there. The relationship centers around an actual buy. Whether he participated in it directly is a matter of another question altogether.

What we are concerned with here, do the officers have enough probable cause to make an arrest. I think they do. The motion to suppress is denied.

## B.

■ We begin by defining the issue before us. "[E]vidence seized pursuant to an illegal arrest is tainted and, therefore, not admissible against the person illegally arrested." *Trusty v. State*, 67 Md.App. 620, 622–23, 508 A.2d 1018 (1986), *modified*, 308 Md. 658, 521 A.2d 749 (1987). In order to be lawful, an arrest must be made either with a warrant or with probable cause. *Id.*, 67 Md.App. at 623, 508 A.2d 1018.

Warrantless Fourth Amendment intrusions are presumptively unreasonable, ... and the burden is allocated to the

State of showing adequate justification for the exceptional departure from the Fourth Amendment norm.

*Id., quoting DiPasquale v. State,* 43 Md.App. 574, 578, 406 A.2d 665 (1979) (citations omitted).

Appellant's arrest was made without a warrant. The question before us, therefore, is whether the State, at the hearing on the motion to suppress, met its burden of demonstrating probable cause for the arrest. In reviewing the evidence presented below, we are mindful of our duty to make an "independent reflective constitutional judgment" of the circuit court's conclusions, *Parker v. State,* 66 Md. App. 1, 10, 502 A.2d 510 (1986), based upon the findings of fact of the circuit court, unless those findings are clearly erroneous. *McAvoy v. State,* 314 Md. 509, 514–15, 551 A.2d 875 (1989).

■ It is important to make clear that the issue before us is *not* whether the police were justified in stopping appellant at the car wash and frisking him for weapons. "An investigatory stop may be made upon 'specific articulable facts' which would lead a reasonable police officer at the inception of the stop to conclude that a brief detention of the individual was appropriate." *State v. Williams,* 84 Md.App. 738, 744–45, 581 A.2d 864 (1990) (citations omitted). *See also Payne v. State,* 65 Md.App. 566, 570, 501 A.2d 484 (1985) (officer may frisk a person for weapons if the officer "perceives conduct which reasonably leads him to believe that the person ... may be armed and dangerous"). The quantity and quality of evidence required to create reasonable suspicion under the stop and frisk exception to the Fourth Amendment warrant requirement is significantly less than that required to show probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to

establish probable cause but also in the sense that reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause.

*State v. Williams,* 84 Md.App. at 745, 581 A.2d 864 (citations omitted).

The circuit court expressly declined to rule on the evidence regarding what happened at the car wash. Accordingly, we cannot address the issue of whether the police actually made an investigatory stop, as the testimony of Diseroad and Xenos suggests, or simply placed appellant under arrest, as appellant's testimony suggests. As we have already indicated, "first-level facts," such as the credibility of the testimony of a witness, are the province of the circuit court. *Parker v. State,* 66 Md.App. at 10–11, 502 A.2d 510.

> An appellate court can reject the testimony of a witness credited by the triers of fact only when the testimony is inherently improbable. There must exist a physical impossibility that the statements of the witness are true or their falsity must appear without resorting to inferences or deduction. The appellate court may not substitute its judgment with respect to the credibility of a witness for that of the jury and trial judge on the ground that the evidence is inherently improbable unless it is so clearly false and unbelievable that reasonable minds may not differ.

*Borgen v. State,* 58 Md.App. 61, 79–80, 472 A.2d 114 (1984) (citations omitted). *See also Dixon v. State,* 23 Md.App. 19, 38, 327 A.2d 516 (1974) (discussing difference between "first-level facts of 'who, what, when and where'" and "ultimate, second-level, constitutional fact"). Since we cannot say that the testimony of either Diseroad and Xenos or appellant is "so clearly false and unbelievable that reasonable minds may not differ[,]" and since the circuit court declined to express an opinion as to the truth of their testimony regarding what occurred at the car wash, except

to state that such evidence constituted "window dressing," [4] we are without any facts concerning events that occurred at the car wash upon which to base an independent judgment. Therefore, we must determine whether the warrantless arrest of appellant was based upon grounds sufficient to pass constitutional muster without considering events occurring after Alpert and appellant left the Complex.

It is also appropriate to note that the legality of appellant's arrest may not be determined with the benefit of hindsight. *See United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948) ("In law it [the search] is good or bad when it starts and does not change character from its success"). Thus, the fact that appellant ultimately confessed to possession of two ounces of cocaine, and the fact that seven hundred dollars that Dorsey had given to Alpert in exchange for cocaine was recovered from appellant, cannot influence our consideration of whether the police had probable cause to arrest appellant.

## C.

The circuit court found Kriete's version of what he observed at the Complex to be credible. We accept the court's findings of fact. Based upon those findings, we now make our own appraisal of whether the circuit court was correct in ruling that appellant was lawfully arrested. We recognize that

> probable cause is not to be evaluated from a remote vantage point of a library, but rather from the viewpoint of a prudent and cautious police officer on the scene at the time of the arrest. The question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably

---

**4.** "Window dressing" is defined in Webster's Collegiate Dictionary 1351 (9th ed. 1989) as "something used to create a deceptively favorable or attractive impression."

could have believed that a crime had been committed by the person to be arrested[.]

*Parker v. State,* 66 Md.App. at 8, 502 A.2d 510 (citations omitted). *See also Malcolm v. State,* 314 Md. 221, 230, 550 A.2d 670 (1988) (determination of whether probable cause exists in a particular case is made by the "totality of the circumstances" test set forth in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ Based upon Kriete's testimony, which the circuit court found to be credible, we gather that the following facts caused Kriete to conclude that appellant had committed a crime: (1) appellant was talking to Alpert, a known drug dealer; (2) appellant was in Alpert's apartment, a place where the police had probable cause to believe that drugs were present; (3) appellant was in proximity to the drug transaction between Alpert and Dorsey; (4) appellant was not immediately involved in the transaction but appeared to be observing or overseeing it from afar; (5) Alpert arranged for the transaction to take place in the parking lot, though the previous transaction (at which appellant was not present) had taken place in Alpert's apartment; (6) Alpert's most recent source of cocaine had been incarcerated; and (7) Alpert scheduled the transaction for a time when appellant happened to be present.

■ With regard to the first fact, it is settled that mere association with a known or suspected criminal does not create probable cause to arrest. *Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).[5] It is also settled that mere presence in a known or suspected criminal's apartment does not create probable cause to arrest. *See Aguilar v. State,* 88 Md.App. 276, 288–89, 594 A.2d 1167 (1991) (rejecting contention that police had probable cause to arrest appellant "because appellant was shirtless, wide-eyed, nervous, appeared at a place where drugs

---

5. We note that Kriete was completely ignorant regarding the content of the conversation between Alpert and appellant.

were, and asked for a person who had just been arrested"); *Sibiski v. State,* 19 Md.App. 149, 152, 310 A.2d 200 (1973) (no probable cause to arrest where appellant found in the living room on the first floor of an apartment where "marijuana parties were held" and a "small amount" of marijuana was found in the pocket of a jacket on a bed in the second floor bedroom). Likewise, mere physical proximity to a crime cannot support a finding of probable cause. *United States v. Everroad,* 704 F.2d 403, 407 (8th Cir.1983); *United States v. Di Re,* 332 U.S. at 593, 68 S.Ct. at 228. *See also State v. Brazil,* 269 N.W.2d 15 (Minn.1978) (where woman was arrested for selling narcotics inside cafe, passenger in her car outside cafe who evidenced no connection with crime other than being passenger could not be legally arrested).

An examination of the *Di Re* and *Everroad* decisions demonstrates the failure of the first set of facts offered by Kriete to support a finding of probable cause to arrest. In *Di Re,* the Supreme Court was presented with the question of whether a warrantless arrest of Di Re was justified under the following circumstances: police, informed by Reed that he was to buy counterfeit gasoline ration coupons from Buttitta at a named place, went to the appointed place and found Reed, Buttitta and Di Re in Buttitta's car. Reed, who was sitting in the back seat, held two gasoline ration coupons in his hand which later proved to be counterfeit. On being asked, Reed said he obtained them from Buttitta. It was conceded that "at the time of the arrest the officers had no information implicating Di Re and no information pointing to possession of any coupons, unless his presence in the car warranted that inference." *Id.,* 332 U.S. at 593, 68 S.Ct. at 228. The Court held that, under the circumstances, a warrantless arrest of Di Re was not justified. The Court reasoned, in part, as follows:

> The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-

out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal.... Presumptions of guilt are not lightly to be indulged from mere meetings.

*Id.*

In *Everroad,* police observed Everroad accompanying a known drug dealer who the police knew was then involved in a drug transaction to areas where the transaction was being arranged. The drug dealer also had stated that he would deliver some cocaine within a half hour, and the police knew Everroad was located less than a half hour away from the location of the sale. Nevertheless, the court held that those facts alone did not constitute probable cause to arrest Everroad. *United States v. Everroad,* 704 F.2d at 407. The *Di Re* and *Everroad* decisions demonstrate that association with a known criminal, presence in that criminal's apartment, and physical proximity to a crime are insufficient to support a finding of probable cause to arrest.

■■ Kriete, of course, offered more facts in support of his conclusion that appellant was Alpert's drug supplier. We turn, then, to the second set of facts offered by Kriete. Appellant's activity of standing at the window in the hallway outside Alpert's apartment apparently gazing into the parking lot below cannot be characterized as "visibly" or obviously criminal. *United States v. Di Re,* 332 U.S. at 593, 68 S.Ct. at 228. Nevertheless, Kriete explained that this activity, which would appear wholly innocent to the untrained observer, was suspicious to him under the circumstances because it conformed to behavior typical of drug suppliers. *See State v. Amerman,* 84 Md.App. 461, 493, 581 A.2d 19 (1990) (seemingly innocent activity may become suspicious in light of knowledge or experience of police). Appellant's engaging in an activity typical of drug suppliers, along with appellant's association with a known criminal, presence in that criminal's apartment, and physical proximity to a crime perhaps serve to fit appellant into the profile of a drug supplier. It is settled, however, that while

the fact that an individual fits such a profile may give police adequate grounds for suspecting that individual of carrying drugs and for stopping him or her, it does not establish probable cause to arrest. *Florida v. Royer,* 460 U.S. 491, 501–07, 103 S.Ct. 1319, 1326–29, 75 L.Ed.2d 229 (1983). As we have already indicated, "[r]easonable suspicion is a less demanding standard than probable cause[.]" *State v. Williams,* 84 Md.App. at 745, 581 A.2d 864 (citations omitted).

Given the record before us, the fact that Alpert arranged for the transaction to take place in the parking lot, though the previous transaction (at which appellant was not present) had taken place in Alpert's apartment, does not support the conclusion that appellant was Alpert's drug supplier. Kriete testified that Alpert's most recent drug supplier had been incarcerated, and that it is "not uncommon" for drug dealers to keep stashes of drugs obtained from one supplier at different locations. There is no evidence in the record as to whether Alpert was in possession of the cocaine he sold to Dorsey when he met Dorsey in the parking lot or retrieved it from elsewhere after he and Dorsey drove off in Alpert's car. Thus, based on the record before us, it is as likely as not that Alpert arranged for the transaction to take place in the parking lot because he needed to retrieve the drugs he intended to sell to Dorsey from a location where he kept a stash.

Turning to the sixth and seventh facts offered by Kriete, we are unable to agree with the conclusion that the incarceration of Alpert's most recent drug supplier (presumably creating a need for a new supplier), together with appellant's presence at the time of the prearranged sale, support the conclusion that appellant was Alpert's source of cocaine. Such a conclusion is necessarily premised upon the unsubstantiated fact that Alpert needed a source of supply nearby at the time of the sale. There is nothing in the record to indicate that Alpert expressed such a need to Dorsey or anyone else. Moreover, Kriete testified that it is "not uncommon" for drug dealers to keep stashes of drugs

obtained from one source of supply at different locations. Thus, based upon Kriete's testimony, appellant may have been able to continue to sell drugs without a drug supplier simply by dipping into a stash of drugs. In other words, Alpert could have sold Dorsey part of a stash he had obtained from his most recent source and kept hidden somewhere for the purpose of making future sales. Furthermore, there is no evidence in the record as to the frequency with which guests appeared at Alpert's apartment, which evidence might enable us to judge the likelihood that appellant's appearance at Alpert's apartment was more than mere coincidence.

In our view, the most one can conclude from the fifth, sixth and seventh facts offered by Kriete is that Kriete did not know that appellant was *not* Alpert's drug supplier. Such a conclusion is about as comforting as Cassio's assurance to Bianca, "Not that I love you not." [6]

An examination of two cases in which courts found that probable cause to arrest was established indicates the insufficiency of the facts presented here. In *United States v. Soto*, 908 F.2d 209 (7th Cir.1990), a drug dealer and an undercover officer arranged a drug transaction in the parking lot of a Wendy's restaurant. At the appointed time and place, the officer showed the dealer that he had the money for the drugs, but the dealer responded that his source was elsewhere. The dealer proceeded to make a telephone call from a pay phone in the parking lot and, afterwards, told the officer that he was going to get the drugs from his source, who was five blocks away. The dealer told the officer to meet him back at the parking lot in an hour and then left. Approximately an hour later, the officer saw a car approaching Wendy's with the dealer in the passenger seat. The car pulled into the parking lot and the officer saw the dealer move to open the car door. Suddenly, however, the driver put the car in reverse, backed up and "screeched" off. *Id.* at 210. Shortly thereafter, the dealer

---

6. William Shakespeare, *Othello,* act III, scene iv, line 197.

arrived again, this time on foot, from the direction in which the car had sped. The dealer had the drugs with him. As the dealer and the officer were consummating the transaction, the driver of the car that the dealer had abortively arrived in was observed watching the transaction. The *Soto* court held that police had reasonable cause to believe that the driver was the dealer's source.

In *United States v. Vravis*, 761 F.2d 513 (8th Cir.1985), an undercover officer received a call from a drug dealer informing him that he could get drugs and that his source of supply was en route. The next morning, the dealer called to say that the source had shown up and arranged to meet at a certain location. The dealer also stated that he had a tire problem and that the source was getting a tire to fix his car. Officers watching the meeting location observed a car with out-of-state license plates nearby, the occupants of which appeared to be fixing the dealer's tire. The undercover officer, after arriving at the meeting location and completing the transaction, asked the dealer about his source. The dealer replied that the source was "over there waiting." *Id.* at 515. The *Vravis* court held that the police had probable cause to arrest Vravis, reasoning as follows:

> Here, Vravis and his vehicle were present in the immediate vicinity of the location of the drug transaction at all times before, during, and after the sale. Before the sale, Vravis was seen standing next to the [dealer's] vehicle looking at the front tire. During the sale, Vravis' vehicle was observed in a position from which its occupants could easily view the transaction. Immediately after the sale, [the dealer] was seen driving over to Vravis' vehicle. The agents watched [the dealer] enter the Vravis vehicle, return to his own car, and begin to leave. In addition, at the time of the arrest the agents were aware of the statements made by [the dealer] that very morning referring to his source who was present in town and was helping him fix his tire as 'the guys' and the 'city boys.' [The officer] was also told by [the dealer] at the time of

the transaction that his source was 'over there.' The agents were able to connect 'the guys' to Vravis and his companion when they observed Vravis' conduct and his vehicle with Illinois license plates near the scene of the transaction. From these circumstances, we cannot say the district court erred in finding the agents had probable cause to arrest Vravis.... Here, we find the agents could have reasonably concluded Vravis was [the dealer's] drug source and was present to keep an eye on his investment and to ensure he received his portion of the proceeds from the transaction.

In both *Soto* and *Vravis,* the police were aware of statements made by drug dealers indicating that their drug suppliers were nearby and were necessary to the consummation of the planned transactions. In addition, the defendants' whereabouts activities conformed to the drug dealers' statements regarding their supplier's whereabouts activities. These facts allowed the police to arrive at a reasonable conclusion that the defendants were the drug dealer's suppliers. In the instant case, as we have already indicated, police had no reliable evidence that Alpert needed a drug supplier nearby in order to consummate the sale to Dorsey. Moreover, police had no information concerning appellant or his activities, either from Alpert or from anyone else. Thus, the crucial facts supporting probable cause to arrest in *Soto* and *Vravis* are missing in the instant case.

We conclude that the facts presented here do not satisfy the test of probable cause to arrest. The cumulative effect of the facts, evaluated from the viewpoint of a reasonable police officer on the scene, simply does not rise beyond the level of suspicion. *See Parker v. State,* 66 Md.App. at 7, 502 A.2d 510 ("the establishment of 'probable cause' requires more than mere suspicion and less than belief 'beyond a reasonable doubt' "). As we have already indicated, the issue before us is not whether the police were justified in stopping appellant, but rather whether the police were justified in arresting appellant. Accordingly, we must reverse the conviction.

JUDGMENT REVERSED. COSTS TO BE PAID BY BALTIMORE COUNTY.