551 A.2d 875

Joseph Hooper McAVOY

v.

STATE of Maryland.

No. 85, Sept. Term, 1987.

Court of Appeals of Maryland.

Jan. 18, 1989.

**510**

Thomas A. Garland, Columbia, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

Joseph Hooper McAvoy raises two related but analytically separate questions concerning the necessity of giving *Miranda* advice of rights to one detained on suspicion of driving while intoxicated or under the influence. The first question is whether *Miranda* advice must be given before the suspect is asked to perform field sobriety tests. The second is whether such advice must be given to a suspect under arrest before that person is asked to submit to a chemical sobriety test. We shall answer each question in the negative in this case.

I.

At 8:00 p.m. on 28 February 1984, Trooper M. A. DiPietro of the Maryland State Police, accompanied by his wife and child, was driving a marked police cruiser south on Route 32 in the city of Westminster. As he approached the intersection of East Green Street, which was controlled by an automatic signal, he observed McAvoy making a right turn from East Green Street in order to proceed north on Route 32. The traffic light was green for Trooper DiPietro and

red for McAvoy. In making his right turn, McAvoy crossed the center line of Route 32, forcing the trooper off the traveled portion of Route 32. The trooper then made a U-turn and followed McAvoy approximately three-fourths of a mile, at which point he activated his emergency lights.[1] McAvoy stopped in a parking lot, and Trooper DiPietro asked him if he was aware that he had disobeyed an official sign that prohibited right turns on a red light at that intersection. McAvoy admitted making a right turn while facing a red light, but insisted there was no sign at the intersection prohibiting that movement. Trooper DiPietro had formerly been a Westminster city police officer, and knew that such a sign had been posted at that intersection. However, he had not patrolled that area in the last eight months, and recognized the possibility that the sign might have been removed in the interim. In view of McAvoy's insistence that there was no sign, and his own uncertainty, Trooper DiPietro suggested they return to the intersection. They returned in their respective vehicles, and parked in a lighted parking lot near the intersection. Trooper DiPietro walked McAvoy to a point on the lot where they could both see the sign that was posted at the intersection. There, for the first time, the trooper noticed McAvoy had watery and bloodshot eyes, a flushed face, and the odor of alcohol on his breath. He then asked McAvoy to recite the alphabet, and to accomplish a finger-to-nose test. McAvoy did not fare well on either test,[2] and Trooper DiPietro placed him under arrest for driving while intoxicated.

---

**1.** Trooper DiPietro, who at that time was assigned to the College Park Barrack, did not immediately stop McAvoy because he wished to call in the vehicle tag number and his location at the time of the stop, and he did not have the Westminster Barrack frequency immediately available to him. When he was able to communicate with the Westminster Barrack on the state-wide frequency, he made the stop.

**2.** According to Trooper DiPietro, McAvoy made three or four attempts to recite the alphabet, never progressing beyond the letter "P." On one occasion, his recitation consisted of "A–B–C–Z–Z–Z–P." With respect to the finger-to-nose test, the trooper said that McAvoy could not or would not follow his instructions concerning the manner in

At 8:45 p.m., shortly after the arrest, Trooper DiPietro read McAvoy a standard form DR–15,[3] which explained

---

which the test was to be performed. Heel-to-toe walking or other balance tests were not attempted because McAvoy said he had problems with his ankles.

3. The DR–15 form, Advice of Rights to a Chemical Test, provided as follows:

Any person who drives a motor vehicle on a highway or on any private property that is used by the public in general in this state is deemed to have consented, with certain limitations, to take a Chemical Test to determine the alcohol content of his blood.

Pursuant to law, I am hereby advising you that you have been stopped or detained on reasonable grounds on suspicion that you have been driving or attempting to drive a motor vehicle while intoxicated or while under the influence of alcohol. I am further advising you that Maryland Law requires the type of test to be administered shall be the chemical test of breath except that the chemical test of blood shall be the type of test administered if:

(1) The defendant is unconscious or otherwise incapable of refusing to take a chemical test for alcohol;

(2) Injuries to the defendant require removal of the defendant to a medical facility or

(3) The equipment for administering the chemical test of breath is not available.

The results of such test may be admissible and may be considered with other competent evidence in determining your guilt or innocence in any prosecution relating to your driving or attempting to drive a motor vehicle, while either intoxicated or under the influence of alcohol.

That you have the right to refuse to submit to the test and on your refusal, no test shall be administered.

That your refusal to submit to a chemical test shall result in administrative penalties being imposed that may include a suspension of your driver's license and/or driving privilege for not less than 60 days nor more than 6 months for a first offense and not be less than 120 days nor more than 1 year for a second or subsequent offense.

That after submitting to a chemical test administered at the request of the arresting officer, you may also have a physician of your choice to administer a chemical test in addition to the one administered at the direction of the police officer.

I have read or have been read the Advice of Rights for Chemical Test and have been advised of administrative penalties that shall be imposed for refusal to take test. I understand that this requested test is in addition to any preliminary road-side test that was taken. Having been so advised, do you now agree to submit to a Chemical Test to determine the alcohol content of your blood? (*This is not an admission of guilt.*)

McAvoy's rights and obligations under Maryland's "implied consent" law, Maryland Code (1977, 1984 Repl.Vol.) § 16–205.1 of the Transportation Article. McAvoy elected to take a chemical sobriety test, and at 9:09 p.m. he signed the DR–15 and submitted to a breathalyzer test. He was not advised of his *Miranda* rights until 9:35 p.m.

Prior to trial in the Circuit Court for Carroll County,[4] McAvoy moved to suppress evidence of the results of the field sobriety tests and the chemical sobriety test. Following a full hearing before Judge Robert H. Heller, Jr., the motion was denied. At trial, the parties proceeded on an agreed statement of facts, and the defendant persisted in his objection to the introduction of evidence of the tests. The trial judge overruled the objection. The breathalyzer test results showed that McAvoy had .20 percent by weight of alcohol in his blood, a reading high enough to constitute prima facie evidence that McAvoy was intoxicated.[5] McAvoy was convicted of driving while under the influence of alcohol, and sentenced. He appealed to the Court of Special Appeals, and that court affirmed the judgment. *McAvoy v. State,* 70 Md.App. 661, 523 A.2d 618 (1987). We granted certiorari, and we now affirm.

II.

*Miranda* and Field Sobriety Tests

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that in order to

---

(Officer Check Reply) ☐ yes ☐ no

4. Charges were originally brought in the District Court of Maryland for Carroll County, but were removed to the Circuit Court pursuant to the defendant's demand for a jury trial.

5. At the time, a finding of .13 percent constituted prima facie evidence of intoxication. That percentage was changed by chapters 255 and 734 of the Acts of 1988, so that a finding of .10 percent will now constitute prima facie evidence of intoxication. Maryland Code (1974, 1984 Repl.Vol., 1988 Cum.Supp.) § 10–307(e) of the Courts and Judicial Proceedings Article.

combat the "inherently compelling pressures" of custodial interrogation and to permit a full opportunity to make an intelligent decision concerning the exercise of the privilege against self-incrimination, it was necessary to mandate the exclusion from evidence of statements obtained by custodial interrogation unless the record demonstrated that the defendant had been advised of certain rights, understood them, and voluntarily waived them. McAvoy contends that Trooper DiPietro placed him in custody prior to conducting the field sobriety tests, and that the conduct of such tests amounted to interrogation. Thus, he argues, the dictates of *Miranda* applied to his situation, and the "statements" made by him in the form of physical responses to the field tests must be excluded because they were not preceded by any advice or waiver of rights. We do not agree.

We accept the finding of the trial judge that McAvoy was not "in custody" within the meaning of *Miranda* at the time the field sobriety tests were conducted. This question was raised at the suppression hearing, and Judge Heller heard conflicting testimony bearing on the issue. McAvoy claimed the trooper had ordered him to return to the intersection. Trooper DiPietro testified he "invited" McAvoy to return. McAvoy elicited testimony from the trooper that he had made up his mind to detain McAvoy when he saw his bloodshot eyes and flushed face and detected the odor of alcohol, and that McAvoy would not have been free to leave from that point on. The State countered that the subjective decision of the trooper was not announced until after the field tests were completed, and that the question of custody must be decided only from a consideration of the circumstances as they would have appeared to an ordinary person in the position of the defendant.

Judge Heller resolved the contested issue of fact in favor of the State, finding that "the defendant voluntarily followed the officer to the site of the alleged incident," and concluded that the defendant was not in custody within the meaning of *Miranda* at that time. The credibility of a witness is primarily for the trier of fact to decide, and we

will accept the finding of fact of a trial judge unless it is clearly erroneous. Maryland Rule 8–131(c). This determination of fact was not clearly erroneous. Armed with the facts properly found by the trial judge, we must, however, make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody. *In Re Anthony F.*, 293 Md. 146, 152, 442 A.2d 975 (1982). Under the facts of the case before us, we agree that McAvoy was not in custody in the *Miranda* sense at the time the field sobriety tests were performed.

In *Miranda*, custodial interrogation was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, *supra*, 384 U.S. at 444, 86 S.Ct. at 1612. The issues of whether *Miranda* applied to traffic misdemeanors, and the precise meaning of "custody" in the context of traffic stops, were addressed in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). There, the Court held that *Miranda* does apply to custodial interrogations involving traffic offenses, but that persons temporarily detained pursuant to ordinary traffic stops will generally not be considered "in custody" for the purposes of *Miranda*. *Berkemer*, *supra*, 468 U.S. at 434, 440, 104 S.Ct. at 3147, 3150. In *Berkemer*, a State trooper stopped McCarty after observing his car weaving in and out of a lane on an interstate highway. The trooper asked McCarty to step out of the car and, upon seeing that McCarty was having difficulty standing, the trooper decided that he would be placed in custody and would be charged with a traffic offense. The trooper did not, however, immediately tell McCarty of this decision. Instead, he asked McCarty to perform a field sobriety test and also inquired concerning his recent use of intoxicants. McCarty was unable to perform the balancing test without falling, and admitted to having consumed two beers and having smoked some marijuana a short time before. McCarty was then formally placed under arrest.

In concluding that McCarty had not been taken into custody for the purposes of *Miranda* until he was formally arrested, the Court noted that the initial traffic stop did not constitute custody; that the time of detention from the stop to the arrest was brief; that the detention took place in a public place; and, that McCarty was never told his detention would not be temporary. With respect to the trooper's determination to take McCarty into custody, the Court said:

A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

In language directly relevant to the case before us, the *Berkemer* Court concluded:

[A] single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.

*Id.*

McAvoy contends that his case should be distinguished from *Berkemer* because Trooper DiPietro exercised dominion over him in ordering him to return to the intersection, and because the period of detention was longer than in *Berkemer*. As we have already noted, Judge Heller found that the trooper did not order McAvoy to return to the intersection, but that McAvoy did so voluntarily. Although the elapsed time between the initial stop and the arrest was no doubt longer here than in *Berkemer*, the circumstances were not of a kind likely to exert pressure upon McAvoy sufficient to impair his free exercise of his privilege against self-incrimination. *See Pennsylvania v. Bruder*, 488 U.S. ——, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988). The initial encounter was brief and non-threatening. McAvoy was permitted to drive his own car back to the intersection—a distance of only three-quarters of a mile. There, in a lighted parking lot in a public place, McAvoy was asked to

perform the field tests. We agree with Judge Heller that McAvoy was not in custody within the meaning of *Miranda* at that time.

Our determination that McAvoy was not in custody when the field tests were performed renders it unnecessary for us to determine whether a request to perform field tests under such circumstances would constitute compulsion within the meaning of the Fifth Amendment, *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); nor do we consider whether the Fifth Amendment may be inapplicable on a theory that the product of the field test was real and physical in nature, rather than testimonial. *See United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[6]

## III.

### *Miranda* and the Blood–Alcohol Test

By the time McAvoy was asked to submit to a breathalyzer test, he clearly was in custody. Although that

---

6. State courts considering this issue have generally held that the Fifth Amendment is not implicated in the conduct of ordinary field tests that produce only evidence relating to physical or mental impairment. *See, e.g., State v. Theriault*, 144 Ariz. 166, 696 P.2d 718 (1984); *People v. Ramirez*, 199 Colo. 367, 609 P.2d 616 (1980); *Oxholm v. District of Columbia*, 464 A.2d 113 (D.C. App.1983); *People v. Mulack*, 40 Ill.2d 429, 240 N.E.2d 633 (1968); *Commonwealth v. Brennan*, 386 Mass. 772, 438 N.E.2d 60 (1982); *State v. Arsenault*, 115 N.H. 109, 336 A.2d 244 (1975); *State v. Greene*, 209 N.J.Super. 347, 507 A.2d 743 (1986); *City of Wahpeton v. Johnson*, 303 N.W.2d 565 (N.D.1981); *State v. Medenbach*, 48 Or.App. 133, 616 P.2d 543 (1980); *Delgado v. State*, 691 S.W.2d 722 (Tex.App.1985). *Compare People v. McLaren*, 55 Misc.2d 676, 680–81, 285 N.Y.S.2d 991 (N.Y.Dist.Ct.1967). In *Pennsylvania v. Bruder*, 488 U.S. ——, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988), the Supreme Court reserved the issue of whether recitation of the alphabet in response to custodial questioning is testimonial.

fact changes the analysis, it does not change the result. The breath taken from McAvoy was physical evidence and was not testimonial within the meaning of the Fifth Amendment protection against self-incrimination. In *South Dakota v. Neville,* the Supreme Court said, at 459 U.S. 559, 103 S.Ct. 920:

> In *Schmerber v. California* ... this Court upheld a state-compelled blood test against a claim that it infringed the Fifth Amendment right against self-incrimination, made applicable to the States through the Fourteenth Amendment. We recognized that a coerced blood test infringed to some degree the "inviolability of the human personality" and the "requirement that the State procure the evidence against an accused 'by its own independent labors,' " but noted the privilege has never been given the full scope suggested by the values it helps to protect.... We therefore held that the privilege bars the State only from compelling "communications" or "testimony." Since a blood test was "physical or real" evidence rather than testimonial evidence, we found it unprotected by the Fifth Amendment privilege. (footnote omitted).

Additionally, the *Neville* Court noted, at 459 U.S. 564, n. 15, 103 S.Ct. 923 n. 15, that a police request to take a chemical sobriety test is not an interrogation within the meaning of *Miranda:*

> In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not interrogation within the meaning of *Miranda.* As we stated in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), police words or actions "normally attendant to arrest and custody" do not constitute an interrogation. The police inquiry here is highly regulated by state law, and is presented in virtually the same words to all suspects. It is similar to a police request to submit to fingerprinting or photography. Respondent's choice of refusal thus enjoys no prophylactic *Miranda* protection outside the basic Fifth Amendment protection.

Accordingly, we conclude that *Miranda* warnings, as such, were not required in connection with the breathalyzer test.

This does not end our inquiry, however, because McAvoy has also cast the question of his entitlement to be informed of the right to counsel in another light. Drawing on our holdings in *Brosan v. Cochran,* 307 Md. 662, 516 A.2d 970 (1986), and *Sites v. State,* 300 Md. 702, 481 A.2d 192 (1984), McAvoy argues that because we have recognized a constitutional right to counsel on the part of a person who is put to the decision of taking or refusing a blood-alcohol test, it follows that the results of a test cannot be admitted unless the record shows the defendant had counsel or voluntarily and intelligently waived the right to counsel. Further, he says, an intelligent waiver of counsel is dependent upon prior advice of the existence of that right, and thus *Miranda*-like advice of the right to counsel is required. The argument, though interesting, is flawed. We recognized in *Sites* neither a right of counsel in the Fifth nor Sixth Amendment sense, but rather a deprivation of the right of due process by the unnecessary denial of a specific request for counsel. The difference is significant, and dispositive of this question.

For reasons we have already discussed, McAvoy did not have a Fifth Amendment right to counsel in connection with the decision he was required to make concerning the blood-alcohol test. Nor did he then enjoy a Sixth Amendment right to counsel, because a formal charge had not yet been filed against him. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Sites v. State,* 300 Md. at 712, 481 A.2d 192; *Webster v. State,* 299 Md. 581, 474 A.2d 1305 (1984). The right that McAvoy did enjoy at that point was the right not to be unreasonably refused counsel when requested by him.

We hold, therefore, that the due process clause of the Fourteenth Amendment, as well as Article 24 of the Maryland Declaration of Rights, requires that a person

under detention for drunk driving must, on request, be permitted a reasonable opportunity to communicate with counsel before submitting to a chemical sobriety test, as long as such attempted communication will not substantially interfere with the timely and efficacious administration of the testing process. *Sites, supra,* 300 Md. at 717–18, 481 A.2d 192.

The right to counsel, when it exists, is of such importance that waiver of that right will not be presumed, but will be permitted only when the record affirmatively shows an intelligent and voluntary relinquishment of the known right. *Patterson v. Illinois,* 487 U.S. ——, 108 S.Ct. 2389, 2394–95, 101 L.Ed.2d 261 (1988); *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). Thus, had McAvoy enjoyed the right to counsel in the traditional Fifth or Sixth Amendment sense at the time the decision was put to him, the record would have had to show advice of the right to counsel, and waiver, before the result of the test would have been admissible. The simple fact, however, is that McAvoy enjoyed no such right. *Sites* dealt only with due process concepts of essential fairness. We there found it fundamentally unfair to deny a request for counsel where the defendant was faced with an important decision, and where the granting of the request would not substantially interfere with the timely and efficacious administration of the testing process. We expressly held that the uncharged accused did not enjoy the Sixth Amendment right to the assistance of counsel. *Sites, supra,* 300 Md. at 712, 481 A.2d 192.

McAvoy did enjoy the due process rights we recognized in *Sites* and refined in *Brosan.* Those rights did not, however, entitle him to advice of his right to counsel, nor to termination of testing activity until the appearance, or waiver, of counsel. The test results were properly admitted into evidence.

JUDGMENT AFFIRMED, WITH COSTS.