*Richard Pinheiro, v. State of Maryland*, No. 3009, September Term 2018.
Argued: November 7, 2019. Opinion by Reed, J.

**CRIMINAL LAW > NONJURY OR BENCH TRIAL AND CONVICTION > APPEAL AND TRIAL DE NOVO > REVIEW > QUESTION OF FACT > SUFFICIENCY OF EVIDENCE TO CONVICT**

The issue before this Court calls into question the sufficiency of evidence following Appellant's bench trial, which we will review on both the law and the evidence, and we will not set aside the judgment of the trial court on the evidence unless clearly erroneous.

**CRIMINAL LAW > REVIEW > PRESUMPTIONS > FACTS OR PROCEEDINGS NOT SHOWN BY RECORD > SUFFICIENCY OF EVIDENCE > CONSTRUCTION OF EVIDENCE > CONSTRUCTION IN FAVOR OF GOVERNMENT, STATE, OR PROSECUTION**

**CRIMINAL LAW > REVIEW > VERDICTS > CONCLUSIVENESS OF VERDICT > WEIGHT OF EVIDENCE IN GENERAL > REASONABLE DOUBT**

The test for sufficiency of evidence asks whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**CRIMINAL LAW > REVIEW > QUESTION OF FACT > PRESUMPTIONS > REASONABLE INFERENCE**

We will give deference to all reasonable inferences that the fact-finder draws, regardless of whether the appellate court would have chosen a different reasonable inference.

**STATUTES > CONSTRUCTION > IN GENERAL > PURPOSE > POLICY BEHIND OR SUPPORTING STATUTE**

**STATUTES > CONSTRUCTION > PARTICULAR ELEMENTS OF LANGUAGE > ABSENT TERMS; SILENCE; OMISSIONS**

**STATUTES > CONSTRUCTION > STATUTE AS A WHOLE; RELATION OF PARTS TO WHOLE AND TO ONE ANOTHER > CONTEXT**

To ascertain whether the legislature intended for physical evidence under Criminal Law Article § 9-307(b) to encompass body worn camera footage, we review the statute's plain language, considering the context of the statutory scheme to which it belongs.

**CRIMINAL LAW > NATURE AND ELEMENTS OF CRIME > CRIMINAL INTENT AND MALICE > IN GENERAL**

The term 'specific intent' designates some specific mental element or intended purpose above and beyond the mental state required for the mere *actus reus* of the crime itself.

**CRIMINAL LAW > EVIDENCE > PRESUMPTIONS AND INFERENCES > INTENT OR MENS REA**

Because specific intent is a subjective concept and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence.

**CRIMINAL LAW > EVIDENCE > PRESUMPTIONS AND INFERENCES > PRESUMPTIONS > INTENT**

This Court allows an inference that one intends the natural and probable consequences of his act.

**STATUTES > CONSTRUCTION > CLARITY AND AMBIGUITY; MULTIPLE MEANINGS > ABSENCE OF AMBIGUITY; APPLICATION OF CLEAR OR UNAMBIGUOUS STATUTE OR LANGUAGE > GIVING EFFECT TO STATUTE OR LANGUAGE; CONSTRUCTION AS WRITTEN**

If the statutory language is unambiguous and clearly consistent with the statute's apparent purpose, we apply the statute as written.

**STATUTES > CONSTRUCTION > CLARITY AND AMBIGUITY; MULTIPLE MEANINGS > ABSENCE OF AMBIGUITY; APPLICATION OF CLEAR OR UNAMBIGUOUS STATUTE OR LANGUAGE > PLAIN LANGUAGE; PLAIN, ORDINARY, COMMON, OR LITERAL MEANING**

**STATUTES > CONSTRUCTION > PARTICULAR ELEMENTS OF LANGUAGE > DEPARTING FROM OR VARYING LANGUAGE OF STATUTE**

We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.

**STATUTES > CONSTRUCTION STATUTE AS A WHOLE; RELATION OF PARTS TO WHOLE AND TO ONE ANOTHER > CONFLICT**

**STATUTES > CONSTRUCTION > PRESUMPTIONS AND INFERENCES AS TO CONSTRUCTION > STATUTE AS A WHOLE; RELATION OF PARTS TO WHOLE AND TO ONE ANOTHER > GIVING EFFECT TO ENTIRE STATUTE AND ITS PARTS; HARMONY AND SUPERFLUOUSNESS**

We must view the plain language within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

**STATUTES > CONSTRUCTION > CLARITY AND AMBIGUITY; MULTIPLE MEANINGS > RESOLUTION OF AMBIGUITY; CONSTRUCTION OF UNCLEAR OR AMBIGUOUS STATUTE OR LANGUAGE > PURPOSE AND INTENT; DETERMINATION THEREOF**

**STATUTES > CONSTRUCTION > EXTRINSIC AIDS TO CONSTRUCTION > IN GENERAL**

**STATUTES > CONSTRUCTION > LEGISLATIVE HISTORY > PLAIN, LITERAL, OR CLEAR MEANING; AMBIGUITY**

If the statutory language remains ambiguous, only then will we resolve the ambiguity by considering the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

Maryland courts have long recognized the common law misdemeanor offense of misconduct in office, which is defined as corrupt behavior by a public officer in the exercise of the duties of his or her office or while acting under color of his or her office.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

A person can be found guilty of misconduct in office under one or more of the three types of behavior: (1) misfeasance, (2) malfeasance, and (3) nonfeasance. *Sewell*, 239 Md. App. at 601

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

Nonfeasance is the omission of an act which a person ought to do.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

Misfeasance is the improper doing of an act which a person might lawfully do.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

Malfeasance is the doing of an act which a person ought not to do at all.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

A public officer commits malfeasance by corruptly exceeding the scope of his or her authority and commits misfeasance by acting within the scope of his or her authority but doing so corruptly.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > EVIDENCE > WEIGHT AND SUFFICIENCY**

The measure of what constitutes official misconduct is an imbricating continuum of proof and conduct that toes the sometimes murky line between what is and what isn't within an officer's scope of authority, falls within the overlay on this continuum.

**PUBLIC EMPLOYMENT > CRIMINAL RESPONSIBILITY > OFFENSES > IN GENERAL**

The State is only required to prove that the public officer acted willfully, fraudulently, or corruptly to sustain a conviction for misconduct in office, regardless of whether the official misconduct charge is based on an act of misfeasance or malfeasance.

**CRIMINAL LAW > REVIEW > VERDICTS > CONCLUSIVENESS OF VERDICT > WEIGHT OF EVIDENCE IN GENERAL > WEIGHING EVIDENCE**

**CRIMINAL LAW > REVIEW > VERDICTS > CONCLUSIVENESS OF VERDICT > CIRCUMSTANTIAL EVIDENCE**

To determine whether the State satisfied its burden, we will not reweigh the evidence; rather, we ask if the direct or circumstantial evidence at trial could have persuaded a rational trial judge to conclude" that Appellant was guilty of the underlining offense.

Circuit Court for Baltimore City
Case No. 118023003

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3009

September Term, 2018

_____

RICHARD PINHEIRO

v.

STATE OF MARYLAND

_____

Kehoe,
Reed,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Reed, J.

_____

Filed: March 2, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On January 23, 2018, Richard Pinheiro (hereafter "Appellant") was indicted by a grand jury in the Circuit Court for Baltimore City on two counts: (1) fabricating physical evidence in violation of § 9-307(b) of the Criminal Law Article of Md. Ann. Code and (2) the Maryland common law crime of misconduct in office. Following a bench trial, Appellant was found guilty and sentenced to three years' imprisonment, with all but time served suspended. Appellant timely filed this appeal and presents the following question for our review, which we condensed for concision:[1]

I.      Was the evidence before the trial judge sufficient to support Appellant's conviction for fabricating evidence and misconduct in office?

For the following reasons, we hold that the evidence was sufficient and affirm the trial court's ruling.

---

[1]     Appellant presents the following questions:

1. Did the Trial Court err in finding that the body worn camera video created by the Appellant constitutes "physical evidence?"

2. Did the Trial Court err in finding that the Appellant acted with the intent to "impair the verity" of the body worn camera video?

3. Did the Trial Court err in finding that the Appellant acted with an "intent to deceive" a tribunal when he created the body worn camera video?

4. Did the Trial Court err in finding that the Appellant created the body worn camera video with the intent that it be "introduced in a pending or future official proceeding?"

5. Did the Trial Court err in finding that Appellant's actions constituted malfeasance, to wit, doing something unlawful or wrong in its own right?

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 24, 2017, Appellant was part of a district drug unit conducting surveillance in Southwest Baltimore City, Maryland. In the course of the investigation, a covert officer observed several suspected narcotics transactions in an alley under surveillance. Based on the observation of the covert officer, Appellant and another unit officer stopped and briefly detained a suspected buyer. Acting on the information obtained from the brief detention, officers found narcotics in the center console of the buyer's vehicle. The officers were then directed to search for additional narcotics in the alley where the covert officer initially observed the alleged transactions.

Upon searching the alley, the officers' body worn cameras[2] (BWC) were in activation mode.[3] Hidden in the alley, officers found a knotted bag containing twenty-two

---

[2]  The Baltimore City Police Department General Order Policy 824 on BWC defines BWC as:

> Audio and/or video recording equipment that is affixed to an officer's person, uniform, or equipment, with the capability of capturing, recording, and storing information for later viewing.

This definition is quoted from the BWC policy published on January 1, 2018. This version was not available at any time relevant to the facts of this case.

[3]  The Baltimore City Police Department General Order Policy 824 on BWC defines activation as:

> Pressing the "event" button twice to begin recording audio and video with the BWC.

Deactivation is defined as:

> Pressing and holding the "event" button for approx. four seconds to cease audio and video recording. Upon deactivation, the BWC will enter Buffering Mode.

These definitions are quoted from the BWC policy published on January 1, 2018. This version was not available at any time relevant to the facts of this case.

capsules of white powder suspected to be heroin. Officers then exited the alley and deactivated their BWC. Recognizing how the first bag of drugs was packaged, Appellant, unaccompanied by the other officers, returned to continue the search based on his experience and belief that more drugs existed in the alley. Appellant found an additional plastic bag containing capsules of suspected heroin and then left the alley to show the other officers. It was at that time Appellant was reminded that his BWC was not in activation mode. Appellant then reentered the alley, placed the drugs in a red can, and arranged the can under debris near where he alleged he initially discovered the drugs. After the drugs were in place, Appellant exited the alleyway, activated his BWC, and is heard saying, "I'm going to check here." He then reentered seconds later to "reenact" his search and the discovery of the additional bag of heroin. Appellant picked up the can and pulled out the bag of heroin. He is heard to say, "yo," then displayed the narcotics in front of the camera as if he had discovered the drugs for the first time. Unbeknownst to Appellant at the time, the buffering footage[4] captured video of him placing the drugs in the can and exiting the

---

[4] The Baltimore City Police Department General Order Policy 824 on BWC defines buffering mode as follows:

> When Powered On, but not activated, the BWC captures video but not audio. The video is not stored in permanent memory until BWC activation. Once Activated, the BWC will permanently store video captured 30 seconds prior to the BWC Activation, and all audio and video captured until Deactivation.

This definition is quoted from the BWC policy published on January 1, 2018. This version was not available at any time relevant to the facts of this case.

alley. Appellant subsequently submitted the video to evidence.com[5] at the end of his work shift, however, he did not make any effort to document his failure to record the initial search and seizure or make clear that the video he submitted was a "reenactment."

A man was subsequently charged with possessing the drugs Appellant had found in the alleyway. The Assistant State's Attorney (ASA) assigned to prosecute the case received the BWC footage for review and learned that the video appeared to portray Appellant staging the evidence. When the ASA contacted Appellant for an explanation, he admitted that he arranged the drugs and reenacted the recovery because "they ding us for holidays if we forget to turn our [BWC footage] on." Appellant testified similarly at trial that he created the video to avoid "any kind of repercussions" or "actions from the agency for failure to turn on the camera." Appellant also admitted to another ASA in an unrelated trial that he staged a "'do-over'…because he didn't want to lose days" for failing to activate his BWC.

Following a two-day bench trial before the Circuit Court for Baltimore City, Appellant was found guilty of fabricating physical evidence in violation of § 9-307(b) of the Criminal Law Article and misconduct in office under Maryland common law. He was sentenced to three years' incarceration, with all but time served suspended.

---

[5] Evidence.com is a website owned by Axon Enterprise, Inc. The company provides cloud-based digital evidence storage and management services for law enforcement agencies to manage, review, and share digital evidence, generally for video evidence captured with Axon-branded cameras. Its features include an automated redaction tool, audit trails for chain of custody purposes, and the capability to share evidence with prosecutors and third-parties. *See* Axon Evidence. AXON, https://www.axon.com/products /axon-evidence (last visited Dec. 12, 2019).

## STANDARD OF REVIEW

The issue before this Court calls into question the sufficiency of evidence following Appellant's bench trial, which we will review "on both the law and the evidence, and [we] will not set aside the judgment of the trial court on the evidence unless clearly erroneous." *Jones v. State*, 178 Md. App. 454, 476 (2008); *see Smith v. State*, 415 Md. 174, 184–85 (2010). The test for sufficiency of evidence asks whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Titus v. State*, 423 Md. 548, 557 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will give "deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." *Moody v. State*, 209 Md. App. 366, 387 (2013) (quoting *Robinson v. State*, 209 Md. App. 174, 196 (2012)) (internal quotation marks omitted).

## DISCUSSION

### A. Parties' Contentions

Appellant contends that the evidence at trial was insufficient to support his conviction for fabricating evidence and misconduct in office. In doing so, Appellant first disputes each element of the criminal statute serving as the basis of his convictions. Appellant argues that (1) the BWC footage does not constitute physical evidence; (2) the evidence at trial was insufficient to conclude he intended to impact the verity of the BWC footage; (3) the evidence at trial was insufficient to conclude he acted with the intent to

deceive a tribunal or other official proceeding; and (4) the evidence at trial was insufficient to conclude he created the BWC with the intent that it be introduced in a pending or future proceeding.

Appellant also disputes the validity of his conviction under the common law crime of misconduct in office. He argues that the evidence at trial could not have supported the finding that he committed malfeasance because the act of recording a "reenactment" is not in and of itself wrongful. In response to these contentions, the State retorts that the trial court's verdict—that Appellant violated § 9-307(b) of the Criminal Law Article as well as the common law crime of misconduct in office—was sufficient based on the evidence presented at trial and the reasonable inferences drawn therefrom. We agree with the State.

## B. Analysis

### 1. Fabrication of Physical Evidence

The statute serving as the basis of Appellant's conviction provides, "A person may not fabricate physical evidence in order to impair the verity of the physical evidence with the intent to deceive and that the fabricated physical evidence be introduced in a pending or future official proceeding." Md. Code Ann., Crim. Law § 9-307(b). Since this statute has yet to be interpreted by Maryland courts and because Appellant disputes each element of the statute, we will address each element in turn.

### i. Physical evidence under § 9-307(b)

Appellant argues that, absent instructive language from the legislature or case law, a digital recording does not constitute physical evidence under § 9-307(b). In contrast, the State contends that video recordings fit under the logical definition and practical

6

application of physical evidence because, "if introduced at trial, it would be marked as an exhibit and entered into evidence." Moreover, the State notes that § 9-307(b) operates in "contrast to the nearby statutes[,] which govern influencing testimonial evidence," and suggests that § 9-307(b) was intended to encompass evidence *not* testimonial in nature.

To ascertain whether the legislature intended for physical evidence under § 9-307(b) to encompass BWC footage, we review the "statute's plain language," considering "the context of the statutory scheme to which it belongs." *Gardner v. State*, 420 Md. 1, 9 (2011) (quoting *State v. Johnson*, 415 Md. 413, 421–22 (2010)). The plain language of § 9-307(b) states in part that, "[a] person may not fabricate physical evidence." Black's Law Dictionary defines the term "physical evidence" to be interchangeable with its definition of "real evidence." *Compare Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining real evidence as "physical evidence (such as clothing or a knife wound) that itself plays as a direct part in the incident in question"), *with Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining testimonial evidence as "a person's testimony offered to prove the truth of the matter asserted; [especially], evidence elicited from a witness" and explaining "[a]n assertion is testimonial evidence whether made out of court or in court, if it is offered with a view to persuading the tribunal of the matter asserted") (internal citation omitted); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) (defining testimony as "c: a solemn declaration [usually] made orally by a witness under oath in response to interrogation by a lawyer or authorized public official," cross-referencing "testimonial" with "1: EVIDENCE, TESTIMONY," defining evidence as "1 a : an outward sign: INDICATION b: something that furnishes proof: TESTIMONY; *specf*:

7

something legally submitted to a tribunal to ascertain the truth of a matter," and defining physical as "2 a: having material existence: perceptible [especially] through the senses and subject to the laws of nature…."). Although these definitions are not mandated by law or binding, we find them persuasive in construing the nature of the BWC footage at issue.

We are also guided by the context of the statutory scheme in which § 9-307(b) belongs. *See Gardner*, 420 Md. at 9. The provision appears in Subtitle 3 of Title 9 of the Criminal Law Article and is among other crimes involving the inducement of false testimony, retaliation, and witness intimidation. *See* Md. Code Ann., Crim. Law § 9-302 (prohibiting harming or threatening to harm another with the intent to influence a witness to testify falsely, fail to appear to testify, or fail to report facts relating to a crime); § 9-303 (prohibiting, in part, the harming or threatening to harm another in retaliation for testimony or reporting a crime); § 9-304 (prohibiting, in part, threatening or using force to influence or intimidate a witness); § 9-305 (prohibiting, in part, threatening or using force to influence or corrupt a juror); § 9-306 (prohibiting, in part, threatening or using force or corrupt means to obstruct or impede the administration of justice in a court of the State). Considering the enactments under Subtitle 3, we find the State's assertion—that the legislature intended for § 9-307(b) to encompass all evidence *not* testimonial in nature—compelling.

In further support of its position, the State underscores the Supreme Court's distinction between testimonial and "real or physical evidence" in the Fifth Amendment context, particularly when assessing the nature of the evidence. *See Schmerber v. California*, 384 U.S 757, 764 (1966); *McAvoy v. State*, 314 Md. 509, 518 (1989). It is true

8

that an officer's BWC footage creates both a visual and audio record of an officer's investigation, actions, and encounters with the public. As such, BWC footage can fit neatly into the definition of both physical and testimonial evidence. *Compare Tobias v. State*, 37 Md. App. 605, 615 (1977) (treating the admission of videotape recordings the same as the admission of photographic [i.e. physical] evidence); *with Derr v. State*, 434 Md. 88, 106 (2013) (explaining that the rights guaranteed under the Confrontation Clause only apply to testimonial statements made out-of-court being offered to prove the truth of the matter asserted). Furthermore, an officer or witness's statements captured on BWC during the pursuit or the investigation of a suspect can raise Confrontation Clause issues when the statements are introduced to prove the truth of the matter asserted in the statement. *Id*. at 106 ("Under the framework established by *Crawford* and its progeny, the Confrontation Clause only applies when an out-of-court statement constitutes testimonial hearsay."). However, in the instant case, the purpose of the footage played a direct part in the discovery of evidence for a future proceeding and *not* for the purpose of admitting the officer's assertions for the truth of the matter asserted. Additionally, the overall statutory scheme suggests that physical evidence encompasses evidence *not* testimonial in nature. Hence, we hold that the BWC footage qualifies as physical evidence under § 9-307(b).

### ii. Intent to impair the verity of the physical evidence

Appellant contends that the video was a truthful reenactment of the manner of the search and location of the narcotics, and the evidence at trial was insufficient to conclude he intended to impair the verity of the BWC footage. Appellant argues without any evidence that the initial off-camera search "differed in any legally significant way" from

9

the BWC reenactment, the State did not prove that the BWC footage documenting the manner of recovery impacted the verity of the BWC footage. We disagree.

To satisfy the requisite intent under § 9-307(b), the State must show that the defendant intended to impair the verity of evidence. The plain language of the statute clearly indicates that the fabrication of physical evidence is, in part, a specific intent crime. *See Harris v. State*, 353 Md. 596, 604 (1999) ("When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.") (internal citation omitted). "The term 'specific intent' designates some specific mental element or intended purpose above and beyond the mental state required for the mere *actus reus* of the crime itself." *Harris*, 353 Md. at 605 (internal citation omitted). However, because such intent is a "subjective [concept] and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." *Buck v. State*, 181 Md. App. 585, 641 (2008) (quoting *State v. Raines*, 326 Md. 582, 591 (1992)). Hence, this Court allows an inference that "one intends the natural and probable consequences of his act." *Buck*, 181 Md. App. at 642 (quoting *Smallwood v. State*, 343 Md. 97, 105 (1996)).

In the instant case, the evidence at trial was sufficient to conclude that Appellant specifically intended to stage the contents of the BWC footage in order to deceive any subsequent viewer of the video's authenticity. At trial, the State presented evidence that all Baltimore City police officers receive training on BWC policy, including when and when not to record. Such policy is provided for in Baltimore City Police Department

10

General Order Policy 824 on BWC ("General Order 824"),[6] which states in relevant part, "[u]nless unsafe, impossible, or impractical to do so, the BWC shall be activated: At the initiation of a call for service or other activity or encounter that is investigative or enforcement-related in nature." (internal numeration omitted). Reading from General Order 824, Lieutenant Nichols testified at trial:

> When a member does not activate the camera as the subsequent [sic] directs either because of danger, because one of the above exceptions applied, because the camera was inoperable or because [of] the member's mistake the member must record that reason why the camera was not activated either on camera or in writing at the earliest time practicable.[7]

Moreover, Lieutenant Rosenblatt, a supervisor and instructor with the Educational Training Division for the Baltimore City Police Department, testified that he instructed the BWC training session that Appellant attended in August of 2016. Lieutenant Rosenblatt similarly testified that the officers are taught during the mandatory training on the BWC that if the camera is not activated for any reason when it should be active, the officer must document the failure. Lieutenant Rosenblatt explained that the officer can either "look into the camera and explain what happened[,]…author an administrative report[,] or put it into the incident report" detailing the encounter, "but it needs to be documented in some way."

---

[6]     At trial, the State entered the BWC policy published on May 1, 2016. The policy has since been amended.

[7]     Baltimore City Police Department General Order 824 reads:
When a member does not activate the camera as this subsection directs, either because of danger, because one of the above exceptions apply, because the camera was inoperable, or because of the member's mistake, the member must record the reason why the camera was not activated, either on camera or in writing, at the earliest time practicable.

11

Contrary to General Order 824, Appellant did not document his failure to activate the BWC when he reentered the alley to search for additional narcotics.

The inferences drawn from the BWC footage admitted at trial further support the conclusion that Appellant intended to impair the verity of the BWC footage. Unbeknownst to Appellant at the time, the buffering footage captured Appellant holding a plastic bag full of white objects, later identified as gel capsules of heroin; entering the alley; placing the bag inside of a can among a pile of trash; then exiting the alley. Once the heroin is in place and he is properly positioned, Appellant activated the BWC and is heard saying, "I'm going to check here," creating the impression that he had entered the alley for the first time. Making matters more conspicuous, another officer can be heard laughing in the background of the video as Appellant pretended to search through the trash for the first time. Seconds later, Appellant picked up the can and pulled out the bag of heroin. He is heard to say, "yo," then displayed the narcotics in front of the camera, to mislead any subsequent viewer into believing that he had seized the drugs for the first time. His statements and actions taken together support the reasonable conclusion that Appellant had the specific intent to impair the verity of the BWC footage.

Furthermore, any inference drawn from his actions is made more compelling considering his trial testimony that he created the video to avoid "any kind of repercussions" or "actions from the agency for failure to turn on the camera." The ASA assigned to prosecute the man charged with possessing the drugs shed further light onto Appellant's motive. The ASA testified that after he confronted Appellant that the BWC footage looked as if Appellant planted evidence or tried to reenact it, Appellant admitted,

12

"they ding us for holidays if we forget to turn our [BWC footage] on so, you know." Moreover, another ASA testified at trial that Appellant told her about the "reenactment" after the proceeding of an unrelated matter. She testified that Appellant told her, "he had recovered the drugs, realized that his [BWC] was not on and staged essentially… a 'do-over'…because he didn't want to lose days." Such evidence was sufficient to conclude Appellant deliberately altered the BWC footage so that he could avoid future discipline.

To address Appellant's contention that the BWC footage was substantively consistent with the initial off-camera recovery of narcotics, we refer back to his testimony at trial. Although he contends his "reenactment" efforts were intended to document where he had found the drugs, Appellant concedes that it would have been "impossible" to place the drugs back exactly where he initially found them. Furthermore, the time stamp on the video created an affirmatively misleading record of when he supposedly found the drugs. We emphasize, as did the trial judge, while Appellant's failure to activate his BWC was "simply [a] violation of General Order 824[,]" his decision to create the "video knowing that it did not honestly represent" what he purported it to be, constituted a fabrication of evidence with the intent to deceive. Hence, the evidence before the trial judge was sufficient to conclude Appellant impaired the verity of the BWC footage with the intent to deceive.

### iii.     Intent to deceive and that the physical evidence be introduced in pending or future official proceeding

At trial, Appellant testified that his intent in creating the BWC footage was "[t]o document where the evidence was and how [he] found it and to prevent…any kind of action

13

from the agency for failure to turn on the camera." On this premise, Appellant argues that §9-307(b) was not intended to criminalize a general intent to deceive some third-party, rather the specific intent to deceive an entity conducting the current or prospective official proceeding. Conversely, the State contends that the intent to deceive is general, requiring only that a defendant has an intent to deceive observers of the fabricated physical evidence into believing the evidence is authentic. The State continues that, even if the statute requires specific intent to deceive an official proceeding, the trial judge had sufficient evidence to convict Appellant. Before addressing whether the evidence was sufficient to support Appellant's conviction, we will first resolve the requisite *mens rea* under the statute.

To determine whether the legislature intended for the State to prove the defendant had a general intent to deceive or a specific intent to deceive a tribunal, we begin our analysis by reviewing the plain meaning of the statutory text. *See State v. Bey*, 452 Md. 255, 265 (2017) (citing *Johnson*, 415 Md. at 421–22). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose…we apply the statute as written." *Bey,* 452 Md. at 265. "We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal citations and marks omitted). However, we must view the plain language:

> within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and

14

harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

*Id.* at 266. If the statutory language remains ambiguous, only then will we resolve the ambiguity by considering "the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.*

The plain language of §9-307(b) requires, in relevant part, an "intent to deceive and that the fabricated physical evidence be introduced in a pending or future official proceeding." We read §9-307(b) to unambiguously require a specific intent to impair the verity of the physical evidence, however, a general intent to deceive observers of the fabricated evidence into believing the evidence is authentic. Contrary to Appellant's assertion, nothing in the plain language of the statute requires a specific intent to deceive a tribunal. Even if §9-307(b) was interpreted to require a specific intent to deceive a tribunal, the evidence at trial was sufficient to conclude Appellant intended to deceive a tribunal.

The trial court drew inferences from Appellant's (1) creation of the video to give the impression that his BWC was initially active; (2) failure to document that the video was a reenactment; and (3) submission of the video, knowing it did not authentically represent what he purported it to be. Furthermore, he understood that by uploading the BWC footage to evidence.com, an ASA would receive and review the video. Appellant testified at trial that he knew "any information [he] had about how the evidence [had been] recovered [was] important" to the future criminal prosecution of the man charged and that "the evidence [would] be used to sustain a conviction against" the defendant. He also acknowledged an understanding that if convicted, the man could face jail time. Only after

15

having been confronted by the assigned ASA that the footage appeared to be staged, did Appellant admit the video was a "reenactment." The inferences deduced by the trial judge were sufficient to conclude that Appellant intended that the BWC be introduced in a pending or future proceeding. And, by impairing the verity of the BWC, Appellant intended to deceive the police department, the State, and a tribunal.

## 2. *Misconduct in Office*

We now turn to Appellant's second contention, which is whether the evidence before the trial court was sufficient to convict Appellant of misconduct in office. Appellant argues if his actions do not constitute a fabrication of physical evidence for the reasons argued above, his action cannot constitute misconduct in office. He further avers that his failure to act in accordance with the BWC policy of General Order 824 does not support a finding that he committed malfeasance in office, and the act of recording a reenactment is not in and of itself a wrongful act. The State rebuts, arguing that the malfeasance occurred when Appellant created the misleading video and submitted it without any indication that it did not honestly represent what he purported it to be.

To determine whether the evidence before the trial judge was sufficient, we must first establish whether the State proved the necessary elements of the offense. *See Sewell v. State*, 239 Md. App. 571, 601 (2018); *Leopold v. State*, 216 Md. App. 586, 604 (2014). Maryland courts have long recognized the common law misdemeanor offense of misconduct in office, which is defined as "corrupt behavior by a public officer in the exercise of the duties of his [or her] office or while acting under color of his or her office." *Sewell*, 239 Md. App. at 601 (quoting *Leopold*, 216 Md. App. at 604) (internal marks

16

omitted). A person can be found guilty of misconduct in office under one or more of the three types of behavior: (1) misfeasance, (2) malfeasance, and (3) nonfeasance. *Sewell*, 239 Md. App. at 601. This Court has explained the distinction in *Sewell v. State*:

> "'Nonfeasance is the omission of an act which a person ought to do; misfeasance is the improper doing of an act which a person might lawfully do; and malfeasance is the doing of an act which a person ought not to do at all.'" [State v. Carter, 200 Md. 255, 262 (1952)] (quoting *Bell v. Josselyn*, 69 Mass. 309, 311 (1855)). By way of example, a public officer tasked with awarding government contracts can commit *malfeasance* by rewarding a political donor with a public contract that the officer had no authority to grant and may commit *misfeasance* by rewarding the donor with a contract that is within the officer's authority to grant. [Rollin M. Perkins & Roland N. Boyce, *Criminal Law* 543, 545 (3d ed. 1982)]. Accordingly, a public officer commits malfeasance by corruptly exceeding the scope of his or her authority and commits misfeasance by acting within the scope of his or her authority but doing so corruptly. *Compare Piper v. Pearson*, 68 Mass. 120, 123 (1854) (holding that a magistrate was liable for finding the plaintiff in contempt in an action over which the magistrate had no authority to preside) *with People v. Norton*, 7 Barb. 477, 478, 480-81 (N.Y. App. Div. 1849) (explaining that, although the law may grant an officer "discretionary jurisdiction" to grant liquor licenses, that discretion cannot be "willfully abused[,]" and the officer may not grant or refuse to grant a license based on "corrupt and improper motives").

*Id*. at 602.

This Court further noted in *Sewell* that "the measure of what constitutes official misconduct is an imbricating continuum of proof" and "[c]onduct that toes the sometimes murky line between what is and what isn't within an officer's scope of authority, falls within the overlay on this continuum." *Id*. at 605. Distinguishing between what conduct constitutes malfeasance or misfeasance is not always evident. *See id*. at 605. Hence, we have held that the State is only required to prove "that the public officer acted 'willfully, fraudulently, or corruptly' " to sustain a conviction for misconduct in office, regardless of

17

whether the official misconduct charge is based on an act of misfeasance or malfeasance. *See id.* at 602 (quoting *Friend v. Hamill*, 34 Md. 298, 304 (1871)). The distinction between misfeasance and malfeasance becomes relevant particularly when proving intent.[8] *See Sewell*, 239 Md. App. at 604. Accordingly, any discrepancy between Appellant's conviction based on malfeasance or misfeasance is moot if the State proved that Appellant acted willfully, fraudulently, or corruptly. *See Sewell*, 239 Md. App. at 602.

To determine whether the State satisfied its burden, we will not reweigh the evidence; rather, we ask if the "direct or circumstantial" evidence at trial could have "persuaded a rational [trial judge] to conclude" that Appellant was guilty of the underlying offense. *See Id.* at 607. At trial, the State presented sufficient evidence to establish that Appellant: (1) staged the BWC footage to appear as if the video depicted the first time he entered the alley; (2) submitted the BWC footage without any documentation that the video was a recreation and knowing it did not authentically represent what he purported it to be; (3) knew it would be used at a future trial against a defendant to sustain a conviction; and (4) admitted that reenacting exactly when and where he recovered the CDS on BWC would be impossible. Moreover, he did not dispute that he was acting in his official capacity.

---

[8]  A public officer is said to commit malfeasance if "the conduct in question falls outside of the official's discretion and authority, and, if done willfully, is corrupt on its face." See *Sewell*, 239 Md. App. at 604; *Mincher v. State*, 66 Md. 227, 235-36 (1886). When arguing that a public officer committed malfeasance, direct evidence of an intent to act corruptly is not required, rather, corruption can be inferred "because wil[l]fulness and bad intent are necessary or probable accompaniments of malfeasance." *Id.* at 604 (quoting *Carter*, 200 Md. at 263). In contrast, when arguing misfeasance, "because the conduct normally falls within the official's discretion and authority, the State must present evidence that the official intended to act corruptly—with a 'sense of depravity, perversion, or taint.'" *See Sewell*, 239 Md. App. at 604 (quoting Perkins & Boyce, supra, at 542).

18

In finding him guilty of misconduct in office, the court stated, "Undoubtedly, [Appellant's] reenactment of the events as if it were happening for the first time was . . . a willful abuse of his authority for his own personal gain" in order to avoid being "disciplined" and having "to document evidence." The trial court's findings were based on reasonable inferences deduced from the evidence presented at trial and are not erroneous. Thus, we will not set aside the court's judgment.

## CONCLUSION

Accordingly, we find that the trial court did not err in finding Appellant guilty of fabricating evidence under § 9-307(b) of the Criminal Law Article or the common law offense of misconduct in office. The evidence presented at trial was sufficient to support Appellant's conviction. Thus, we affirm.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**